Filed 3/5/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ROY THINNES BUTLER<br><br>on Habeas Corpus. | A137273<br><br>(Alameda County<br>Super. Ct. No. 91694B) |

Inmate Roy Thinnes Butler pled guilty to second degree murder in 1988, when he was 20 years old, for his participation in the slaying of a man who had repeatedly, physically abused two other people. Despite the recommendation of the California Department of Corrections (CDC) that Butler be placed on probation, he was sentenced to an indeterminate term of 15 years to life. The Board of Parole Hearings (Board) has found him unsuitable for parole five times since he first became eligible in 1998. Here,[1] Butler seeks a writ of habeas corpus directing the Board to set aside its order denying him parole, which the Board based on the dual grounds that he lacked insight into the murder and sufficient parole plans.

Under our tripartite system of government, the Legislature has directed that parole is the rule, not the exception; the Board, as a part of an executive branch exercising its broad discretionary authority, determines parole suitability pursuant to certain regulatory

---

[1] Butler filed a supplemental petition for writ of habeas corpus in this court on May 28, 2013, that raised the issues of whether the Board's (1) denial was unsupported by some evidence of current dangerousness, the subject of the present petition; and (2) practice of deferring calculation of the base term for life inmates until after a finding of suitability was unconstitutional. The second issue is the subject of case No. A139411, which was resolved via a Stipulation and Order Regarding Settlement, filed December 16, 2013 (the settlement). As pertinent to this case, the parties have agreed in the settlement to certain facts, which are discussed below.

1

guidelines and proceedings; and we, mindful of these directives and discretionary authority, as well as constitutional mandates, review the Board's decision to determine whether the prisoner has been afforded due process. This delicate balancing of responsibilities amongst the three branches has sometimes resulted in difficult questions about our role.

Fortunately, our Supreme Court has answered these questions, most recently in *In re Shaputis* (2011) 53 Cal.4th 192 (*Shaputis II*). Put simply, we review the Board's decision to deny a prisoner parole to determine if it reflects individualized consideration of all the relevant facts and suitability factors and, if it does, is supported by some evidence that the prisoner currently poses a threat to public safety. (*Id.* at pp. 209-212, 219-221; *In re Prather* (2010) 50 Cal.4th 238, 255 (*Prather*); *In re Lawrence* (2008) 44 Cal.4th 1181, 1211, 1212, 1232 (*Lawrence*).)

It almost goes without saying that the bedrock of this standard is due *process*. The Board's decision must reflect consideration of the interrelationship of *all* relevant facts and suitability factors in determining whether a prisoner is currently dangerous. (*Shaputis II*, *supra*, 53 Cal.4th at p. 225; *Prather*, *supra*, 50 Cal.4th at p. 255; *Lawrence*, *supra*, 44 Cal.4th at p. 1212.) A prisoner cannot be denied parole based on the Board's consideration of only one unsuitability factor, or a few. And because parole can only be denied upon due consideration of all relevant facts and factors, and given the great deference we must afford the Board in its decision-making, when the Board has denied parole for two reasons, one of which is not supported by some evidence of current dangerousness, and we cannot determine whether the Board would have denied parole for the remaining reason stated, we must grant the petition, vacate the Board's decision, and remand for further Board proceedings. (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1461 (*Criscione II*); *In re DeLuna* (2005) 126 Cal.App.4th 585, 598 (*DeLuna*); *In re Smith* (2003) 114 Cal.App.4th 343, 373 (*Smith*); *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306-1307 (*Capistran*); Cf. *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100 (*Dannenberg*).) Both Butler and respondent acknowledge that this is the appropriate procedure.

The Board's decision to deny Butler parole does not meet a number of essential due process requirements. Its first reason for denial, that Butler lacked sufficient insight into the murder, is not supported by any evidence. Butler has expressed responsibility and ample remorse for, and an understanding of why, he participated in, the murder. The Board's decision, therefore, should be allowed to stand only if it is clear the Board would have denied Butler parole based on the only other stated reason for the denial, Butler's insufficient parole plans. It is not clear that it would and, for this reason, we must grant the petition, vacate the decision, and remand for further proceedings.

Three other aspects of the decision inform this conclusion.

First, the Board related its concern that Butler had insufficient parole plans directly to insight, making it even less clear that it would have denied him parole for insufficient plans alone.

Second, as both Butler and respondent acknowledge, if the Board's decision does not reflect individualized consideration of all relevant facts and factors we also must grant the petition. The Board's decision here does not. After the most general and pro forma of references to the record and regulatory factors, the Board focused entirely on just its two reasons why Butler was unsuitable for parole, despite a record replete with reasons for suitability. This is insufficient, and makes it particularly unclear what the Board would have decided based on its parole plan concerns alone.

Finally, the Board's reasoning about Butler's parole plans was flawed in several respects.

Therefore, we grant the petition and remand the matter to the Board for further proceedings.

## BACKGROUND AND PROCEEDINGS BELOW

### *Preconviction History*

Butler was born in August 1967. His home life was not stable. At the age of three, his mother, who was then 17 years old, surrendered custody to a woman who was not a relative, but who Butler called his godmother. Although the chronology is somewhat vague, it appears that this woman raised Butler until he was 15, at which point

he committed a petty theft that resulted in him being declared a ward of the juvenile court.[2]  After spending six months and graduating from Alameda County's Senior Boys Camp, Butler resumed living with his mother.  When she moved away, Butler tried living with his biological father, but then returned to his godmother.  He did not complete high school, but obtained a GED at the East Bay Skill Center.  It was about this time, when he was 20 and not regularly employed, that Butler met Jane Woods.

Butler's first contact with Woods, who was 24 years old at the time, was on a social party line.  It was after they met that Butler learned of Woods's relationship with one Richard Davis.  Woods lived with Davis, who was 17 years old.  Even from afar, Davis evoked revulsion from correctional officials who had subsequent dealings with Butler.  One of those officials described Davis as, "to put it mildly, maladjusted," who was "using his roommate . . . as a punching bag, beating her as often as four times a week and causing her to be sent to the hospital on several occasions.  She also lost her baby due to a miscarriage following a beating."  Determined to put a halt to this, Woods and Lanzester Hymes, who had his own issues with Davis, "decided that Davis would have to be taught a lesson so that he would stop brutalizing this woman."  Butler was drawn into the plot.

### *The Commitment Offense*

Although some details remain murky, the general features of Davis's death on September 28, 1987, are fairly clear.  Initially, while walking on the street, Davis was attacked by a stranger with what was described as a baseball bat or ax handle.  Butler certainly knew in advance, almost certainly facilitated the attack, and may even have instigated it.  Bloodied, Davis staggered to a hospital, where he was treated and released.  Davis then returned to his apartment with Woods, unaware that, having been alerted by Woods, Hymes and Butler were waiting for him, having resolved that he should die.

---

**2**  In a document generated for Butler's 2009 parole hearing, he is described as having been "charged with PC 459 Burglary and PC 496 Receiving/etc. Known Stolen Property."  We assume that the charges were either reduced or Butler was found to have committed the less serious offense.

4

Hymes stabbed Davis once in the chest while Butler was hiding in the bathroom; although armed with a knife, he did not use it. Butler "snuck out" of the house, discarded the knife and was arrested shortly thereafter.

Hymes pled guilty to first degree murder, while Woods and Butler pled guilty to second degree murder.[3] The probation officer did not actually recommend that Butler be admitted to probation, but (reading between the lines) his report was sufficiently sympathetic that it prompted the trial court to request "[a] diagnostic study and recommendation [pursuant to] Penal Code section 1203.03 . . . [¶] . . . with the objective of assessing [Butler's] potential for functioning successfully on probation."

The CDC's recommendation was as follows: "Despite Mr. Butler's plea to [m]urder [s]econd, diagnostic staff regard him to be a suitable probation candidate. He has an insignificant record, and his role in the offense was a minor one. There is no evidence that he identifies with delinquent values, and he is not viewed as a threat to the community. He is seen as having the wherewithal to succeed under local supervision." "The offense is seen as being highly situational. It is therefore recommended that [Butler] be given a suspended prison sentence with probation and the conditions he serve an appropriate period of local confinement, possess no weapons, maintain gainful employment, and perform 200 hours of community service work."

The recommendation was not accepted. On August 29, 1988, Butler was sentenced to state prison for a term of 15 years to life.

### Postconviction Record

Butler had an initial spate of disciplinary problems—none involving violence of any kind—and they abated in time. From May 1989 to April 1998, Butler received 11 "[CDC]-115 Rules Violation Reports." The first nine of these violations classified as "serious," the last two (both in April 1998) as "admin," apparently a reference to the matter being handled "administratively," which we assume is a less formal approach. From August 1998 to September 2008, Butler accumulated 10 "128A's," which are

---

[3] According to Butler, Woods was the first woman paroled under the Battered Woman Syndrome defense in 2000, and Hymes is still serving his sentence.

5

characterized as "Custodial Counseling" reports and address incidents that do not amount to a 115 violation (in Butler's case, such things as grooming standard violations and being late or failing to report.) Butler appears to have remained discipline-free for the three years prior to his most recent psychological evaluation in September 2011.

Butler became eligible for parole in 1998. Jane Woods was released on parole in September 2000. The Board refused to set a release date for Butler in 2001, 2003, 2005, and 2009.

In the evaluation prepared for Butler's 2005 hearing, correction officials noted under the heading "FUTURE PLANS": "If Butler were to be granted parole, he plans on relocating to San Jose and liv[ing] with his grandmother . . . . If he were not granted a transfer to Santa Clara County, he would live with his godmother . . . [in] Oakland. [¶] . . . [¶] If Butler were to be granted parole, Butler claims that he would be able to obtain employment with his cousin, Art (last name, address, and telephone number unknown) who has his own construction business in San Jose. [¶] . . . [¶] Butler's parole plans are not backed up with any letters of support verifying his plans either for employment or housing. While it is noted that Butler was raised by [his godmother] while growing up, a letter of support is needed to confirm."

In a one-paragraph handwritten letter sent to the Board in 2005, Butler's grandmother stated: "I understand that you would like to know if Roy will have a place to live when he come home . . . . He has a place to stay with me his Grand Mother."

One other letter was sent in 2005, from Dr. Tony Williams of the Maranatha Christian Center in San Jose. Salutation and closing aside, it proceeds in its entirety as follows: "As senior pastor of the Maranatha Christian Center, I am writing to offer community support for Mr. Roy Butler following his release. [¶] Butler's mother . . . is a member of our church, and hopes to integrate him into our congregation should he be able to return to San Jose. [¶] We have a congregation that can surround [him] with an abundance of love, support and understanding. Ours is a congregation that has extensive prison ministries, and which works with homeless people and drug addicts as well. I serve as a volunteer for the San Jose County Jail, and am offering all available resources

6

and support that myself and our congregation can provide to help restore this young man's life. [¶] We would appreciate the opportunity to help save and restore the life of this young man."

Almost identical notes were recorded in the evaluation for Butler's 2009 hearing: "FUTURE PLANS": "If Butler were to be granted parole, he plans on relocating to San Jose and liv[ing] with his grandmother . . . . If he were not granted a transfer to Santa Clara County, he would live with his godmother . . . [in] Oakland. . . . Letter is forthcoming. [¶] . . . [¶] If Butler were to be granted parole, Butler claims that he would be able to obtain employment with Pastor Tony Williams. Letter forthcoming. [¶] Butler's parole plans are not backed up with any letters of support verifying his plans for either employment or housing."

What Butler told a psychologist preparing a psychological evaluation for the 2009 hearing was somewhat different: "The inmate reports he intends to live either with his aunt or godmother or sister in Oakland, California upon his release. He acknowledges he has no current letters supporting this claim, but will have them by the time of the Board Hearing. The inmate adds his employment plans are the same as they were in 2005. He suggests that he will be able to find employment from a pastor who operates several businesses and may employ him upon his release. The inmate will secure a letter to present at his Board Hearing." The psychologist further noted that Butler "appears to have the outline of a feasible parole plan," but that plan "would seem more credible if he were to have letters or information confirming his plans and contacts in the community." The psychologist reiterated at a later point that Butler's "parole plan lacks specifics and verification. There are outdated letters that reveal the inmate has employment and living opportunities available to him. He did not present current letters of support for job offerings or a place to live." Butler told the psychologist he "planned to present several letters of support at his next [hearing]." Despite these representations, no letters were submitted.

The evaluation concluded: "If the inmate remains in custody, it is recommended that he: . . . 3.) verify all plans for residence and employment in the community . . . ."

*2012 Psychological Evaluation*

In preparation for his February 2012 hearing, Butler was interviewed and evaluated by Dr. S. Thacker, a psychologist with the Forensic Assessment Division of the Department of Corrections and Rehabilitation. Dr. Thacker's 17-page report addresses many topics, but in the interest of not burdening this opinion with unnecessary detail, only the two subjects at issue will be discussed here.

Under the heading "PAROLE PLANS IF GRANTED RELEASE," Dr. Thacker reported: "Butler stated that his primary plan is to live with his mother in Santa Clara, California in her three-bedroom apartment . . . in a very quiet neighborhood. His secondary plan would be to live with his maternal grandmother in San Jose. Regarding employment plans, he indicated that his mother's pastor has offered him a full-time job with the church and will be sending in an updated letter of support. He indicated that he would be working in the youth program doing mentorship, as well as odd jobs around the church such as cleaning. He did not know how much he would be paid. In addition to his work at the church, Butler stated that he would apply to be his mother's caregiver. Also, he again mentioned that he is close to starting training as a dental lab technician which he described as 'a realistic trade.' When asked if having a job is important to him he replied 'of course . . . to take care of myself . . . be independent . . . keep me out of negative stuff.' He also stated that in a church environment 'you can not go wrong.' He stated that his family, as well as the church pastor, will be willing to help him financially if needed and that they would definitely provide him with emotional/moral support. When asked in what other activities he would be involved in the community, Butler stated 'to be an activist for positive causes . . . hunger drives, church things, educational kinds of stuff.' He also explained again how he is trying to complete tutor training and could tutor youth in the community. When asked about his long-term goals, he replied 'be really involved in the community . . . I want to open a center for youngsters . . . they need alternatives.' When asked what he would need to do to achieve this goal, he mentioned saving money and applying for grants. He also noted that he plans to start taking business courses through Coastline Community College in January, noting that his

8

mother will help him with the cost for books. When asked to describe challenges he might face upon returning to the community, Butler mentioned staying away from negativity and staying focused. He noted that he 'has no habits like drugs or gangs' and added 'I see that as having a head start.' He also mentioned how technology has changed so much during his incarceration but added that he has attempted to 'stay current.'

"Overall, Butler's parole plans appeared generally realistic and feasible; however, they were not particularly detailed or comprehensive. He appears to have the basic building blocks in place (i.e., a place to live and a part-time job); however, it did not appear that he has thought through the various challenges or issues he may encounter in the community and how he plans to address each of them. For example, his plans do not include information regarding mental health resources available to him in the community should he experience difficulties related to any PTSD[4] or depressive symptoms which might arise in the community. Additionally, he has never lived on his own and been responsible for maintaining a residence and will need to learn and develop those skills."

Under the heading "INSIGHT/SELF-ASSESSMENT," Dr. Thacker stated: "Overall, Butler presented as someone who has reflected upon his past and developed a fairly good understanding about why he made particular choices or decisions in his life, including his participation in the life crime. Mr. Butler appeared to have spent less time focusing on his future and how his insights regarding his past could be applied to his future to develop plans and goals about what to pursue, what obstacles he may encounter, and how he should best respond to and manage obstacles."

---

[4] The psychological evaluation prepared for Butler's 2009 hearing noted: "In 1996, the inmate was shot in the face while incarcerated. A riot broke out . . . . He was medically treated and experienced symptoms that led to a diagnosis of Posttraumatic Stress Disorder (PTSD)."

Butler told Dr. Thacker that he "has undergone reconstructive surgery as a result [of the shooting] and has experienced migraine headaches since that time although he reported that they have improved in recent years. He . . . stated that he currently receives no routine medications." Dr. Thacker stated in his report that Butler's "last mental health treatment plan dated 9/5/07 diagnosed him with PTSD, Chronic and Depressive Disorder . . . . [H]e was ultimately discharged from all mental health care in 2008."

9

Under the heading "REMORSE AND INSIGHT INTO LIFE CRIME," Dr. Thacker concluded:

"It should be noted that insight and remorse are abstract concepts, which do not lend themselves to operationalized definition or measurement. Therefore, any opinions regarding insight and remorse are subjective in nature, and should be interpreted with this caveat in mind.

"In 1988, Butler underwent a Diagnostic Study and Recommendation at the Northern Reception Center which ultimately concluded that Butler was considered to be a suitable candidate for probation. During the study, Butler's account of the crime was consistent with records and was consistent with the accounts he has given throughout his incarceration. Over the years, he has spoken about various factors which he believed contributed to his participation in the crime. In the 1991 psychological evaluation for the Board, he reported ' . . . that he had become involved with the wrong crowd and had not listened to his grandparents and had been blind in associating with hoodlums . . . that he should have offered advice to the various parties to desist from the physical abuse and if they did not wish to do so that he would disengage himself from the relationship.' The evaluator stated that in the past, his risk for violence was average but was now decreased.

"In the 1997 psychological evaluation for the Board, Butler was described as showing considerable remorse and the evaluator concluded, 'This inmate has consistently admitted to the instant offense, and demonstrates appropriate remorse and self-criticism for his antisocial attitude at the time of the instant offense. He appears to have developed considerable insight into the contributing factors associated with the instant offense . . . .' The evaluator estimated that in the past his risk for violence was greater than average and was now significantly decreased.[5]

---

[5] The 1997 psychological conclusions by Clinical Psychologist Mark Conroy, omitted by Dr. Thacker, are also worth noting (beginning with the ellipses in the Thacker quote): " ' . . . and has demonstrated some improvement in his disciplinary record while incarcerated. He has demonstrated improved impulse and behavior control and increasing pro-social attitudes. In a less controlled setting, such as the community, he is likely to hold his present gains. His violence potential outside a controlled setting in the

"In the 2000 evaluation he again accepted full responsibility and demonstrated 'considerable remorse.' The evaluator opined that his risk for future violence was low and that he was unlikely to engage in violence in the future.[6]

"In 2005, he spoke of his 'immature decision making' and again stated that at the time he thought he was helping someone and that although he was not in the room where the stabbing occurred, he sensed that something was going to happen and that he could have taken action to stop it. The evaluator rated his risk for future violence as low.

"In 2008, Butler stated that prior to coming to prison, he thought he knew it all and was immature and not an independent thinker. He thought he was helping a friend 'exact revenge.' The evaluator wrote 'The inmate acknowledges he is the person to blame for the crime. He could have left the scene and not gotten involved at all.' The evaluator concluded 'His remorse for the loss of life seems appropriate; however, he seems to minimize his role in the crime.' This evaluator also placed his risk for future violence in the low range.

---

past was considered to have been greater than average. At present, it is estimated to have significantly decreased, as evidenced by the consistently nonviolent nature of his disciplinary write-ups. No specific recommendations are made regarding conditions of parole.' "

[6] Dr. Thacker's summary of the assessment of Dr. Ronald Roston on December 11, 2000, omits much of importance:

"*ASSESSMENT OF DANGEROUSNESS* Butler was never a particularly dangerous person, even during the episodes which led to the murder. Within a controlled prison setting he is amongst the least dangerous inmates. If released to the community he would likely be a low risk. Fortunately, Butler has no drug or alcohol problems and considerable family and marital support. He is unlikely to engage in violence.

"*CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS* Butler is an intelligent man who offers considerable remorse for his life crime. He appears to have been resolving most of his difficulties and behaving well when he was shot, presumably as an innocent in a racial fracas. He now suffers residual depression and residual posttraumatic stress symptoms. Nonetheless, his prognosis is good. This psychologist has no reservation or finds any contraindications to his being given a parole date. He seems very likely to be able to comply with any conditions of parole."

"During the present interview, Butler again discussed his immaturity and ignorance as factors influencing his involvement in the crime. He described how he believed his past experiences influenced his decision making in this situation, especially an experience during which his cousins were discussing exacting revenge against a man who had beaten his mother. He noted that this experience made him believe 'this is how you handle this type of situation.' He also insightfully spoke about having witnessed police brutality in his neighborhood and other people's reactions to the police which contributed to his belief back then that you did not go to the police for help. In contrast, he stated that he now believes that one must abide by laws and rules in order to be successful. He stated that he would now alert police of the abuse and that if the person being abused did not want help getting out of the abusive situation then he would have to 'let them go' (discontinue his relationship with them). When asked about his leadership role in the crime, Butler stated that he believed 'it was a collective idea to go after him . . . me, Julio and Warren . . . she [his female friend who was being abused] found out later on . . . she had to give him the illusion everything was okay and she was not angry so she could take him to the swimming pool [so that Julio could hit him with the axe handle] . . . going there was a normal thing . . . I was not the leader of the whole thing but I had influence and a role in there . . . I could have given a good influence . . . not told Julio who he was . . . not give nothing to go on . . . then there would be no assault . . . if there was no assault then there would be no murder.' When asked who or what he blames for the crime, he stated that he blame[s] himself noting 'I made the decision to get involved.' When asked for his current thoughts about the crime he replied 'now I think everything happens for a reason . . . I take a spiritual perspective . . . we have to learn certain lessons . . . it was something that could have been prevented . . . I don't like what happened and being locked up . . . I can't dwell on it . . . I have to learn from it.' When asked who has been affected by the crime he mentioned that the victim's mother and father attended his grandmother's church and that they experienced great pain over their son's death. He also mentioned the overall affect the crime had on the church, as well as the victim's friends. He also spoke about how the crime affected his [Butler's] mother

but added that it was worse for the victim's family because at least he is alive and his mother can talk to him. When asked what factors would help keep him out of trouble in the future, he responded 'the way I think now . . . more productive, positive . . . not dysfunctional . . . mature . . . I set goals and surround myself with people doing the same thing . . . my maturity.'

"Overall, Butler's account of the crime was consistent with the various accounts he has provided over the years. He presented as someone who has spent time and energy exploring and attempting to understand the motivating factors in the crime. He has developed good insight into those factors which included his tendency to go along with other people and his general level of immaturity, his association with antisocially minded individuals, his antisocial mindset in this situation which had been influenced by his earlier experience when he overheard his cousins planning revenge following his mother's beating, as well as his antisocial mindset which included believing that police were not helpful and, in fact, could be harmful (stemming from the police brutality present in the community). Butler did not appear to try to blame these factors but instead seemed to seek to understand them in order to understand the motivations for his behavior."

Under the heading "INMATE UNDERSTANDING OF LIFE CRIME," Dr. Thacker summarized that "He stated that it was his ignorance and immaturity that led up to his involvement in the crime. He indicated 'my intention overall was to help somebody but I went about it wrong . . . I had dysfunctional thinking.' When asked to describe his dysfunctional thinking and where it came from, he replied 'my environment . . . my peers . . . I saw how they reacted . . . I was thinking violence was the way to deal with that situation . . . to give him a [taste] of his [own] medicine.' "

Under the heading "REMORSE AND INSIGHT INTO LIFE CRIME," Dr. Thacker concluded: "He appeared to accept his role in the life crime as someone who had equal influence in the situation and could have made either a positive or negative impact, and chose to make a negative impact. This evaluator did not sense that Butler

13

sought to minimize his role in the events that occurred and that he held himself responsible for the victim's death; not solely responsible but equally responsible."

Under the heading "ANALYSIS OF RISK POTENTIAL," Dr. Thacker explained the results of several tests administered to Butler: The LS/CMI is "the most widely used risk assessment/management instrument among parole release authorities." "Butler obtained a total score on the LS/CMI that was higher than 3% of the normative sample of incarcerated male offenders in the United States, meaning that 3% of inmates evidenced fewer risk factors associated with general recidivism and that 97% of inmates evidenced more risk factors associated with general recidivism."

Dr. Thacker explained that, "The most pertinent risk factor identified by the LS/CMI for Mr. Butler was his lack of having incorporated the fostering of pro-social relationships with acquaintances and friends, as well as organized resources in the community. As noted, his parole plans were feasible but very basic and lacking in detail. Such detail could be incorporated by researching and contacting support agencies in the community to which he plans to parole and noting how such resources could be used if he is released to the community to help facilitate his successful transition and guard against the possibility of influence by negative sources. This concern stems from Mr. Butler's reports that he was often involved in criminal or negative behavior in order to fit in with his peers. He began to address the issue somewhat through his plans to be involved in church; however, this issue could be more extensively addressed by developing more detailed plans."

Butler was also administered the PCL-R, which Dr. Thacker described as "a standardized instrument developed to assess the lifetime presence of psychopathy and psychopathic traits among men and women in correctional settings." On this test Butler "obtained a Total Score . . . that was higher than 9% of the normative sample of North American male offenders, meaning that 9% of male offenders evidenced fewer traits of psychopathy than Butler and 91% [offenders] evidenced more traits of psychopathy than Butler."

14

Next was the HCR-20, "a structured professional judgment approach to assessing violence risk potential in forensic psychiatric, civil psychiatric, correctional/prison, and community settings," and "among the most widely used violence risk assessment instruments." Butler's historical analysis was mixed, in part because of his life crime and "early maladjustment" as a juvenile, instability in his intimate relationships and difficulties in his early work performance in prison "largely related to his not reporting to work. On the other hand, his more recent work performance has been much improved."[7]

"Clinical Analysis: [Butler] presented with good insight into his past criminal/violent behavior. He was able to meaningfully discuss factors which contributed to these problems. He has been responsive to treatment while incarcerated and has not evidenced significant problems with impulse control or aggression during incarceration. . . . He did not currently present with symptoms of a major mental illness . . . ."

"Risk Management Analysis: Butler has worked toward preparing himself to transition to the community and to manage the challenges of parole. His prospective plans for parole were generally feasible in that he planned to live with his mother, work part-time in his mother's church and apply to become his mother's caregiver. It appeared that Butler also continues to receive support from his siblings.[8] It is likely that Mr. Butler will be exposed to some stressors or de-stabilizers in the free community including, but not limited to the typical stressors associated with returning to the community after a long period of incarceration, and family or relationship conflicts. Also, he has never established and maintained his own residence and will need to learn those skills. Mr. Butler seemed to have a limited understanding of the potential

---

**7** Another negative noted by Dr. Thacker was "a diagnosis of Personality Disorder, NOS with antisocial traits and the fact that he has been diagnosed with PTSD and Depressive Disorder, NOS in the past. . . . [T]hese diagnoses resulted after he was shot in the head during an incident in prison on the yard."

**8** Butler has two sisters (one of whom lives in Florida, and who may or may not be the "sister in Oakland" mentioned in defendant's 2009 evaluation) and two brothers (one of whom lives in Sacramento). Butler is the oldest.

challenges or stressors he may encounter in the community and is encouraged to further explore this area and enhance his parole plans so that his plans address how he will manage any potential challenges.

"SUMMARY OF VIOLENCE RISK ANALYSIS: After weighing all of the data from the available records, the clinical interview, and the risk assessment data, it is opined that Butler presents a **low/moderate** risk for violence in a free community. A low/moderate risk indicates that this evaluator believes the individual represents a slightly elevated risk of violence. He presents with few risk factors that may warrant situational monitoring or risk reduction strategies.

"Based on a review of the case, the risk factor currently of most concern for Mr. Butler involved his parole plans. He reported that he plans to live with his mother, work part-time at his mother's church, and apply to be compensated for being his mother's caregiver. He stated that he would be involved in other positive activities to help the community such as hunger drives, etc. but did not have specific information regarding possible agencies or organizations with which he could become involved. He also had not sought out resources or agencies available to him for support in the community such as mental health services or access should his symptoms of PTSD or depression return. When describing himself, Mr. Butler admitted that he can be lazy at times. His plans appeared to rely heavily upon his mother, suggesting that he has opted to rely upon his mother and has not exerted the effort to establish plans which also include potential resources/sources of support outside his mother.

"Mr. Butler's risk of violent recidivism would significantly *increase* if he associated with antisocial peers. His risk of violent recidivism would likely also increase if he used intoxicating substances, found himself without a stable residence, lacked income sufficient to meet his living expenses, or inadequate social support in the community. [¶] . . . Most importantly, Mr. Butler could *decrease* his risk by establishing and verifying comprehensive, detailed parole plans which consider possible challenges he may face in the community and address how he will guard against or manage those challenges."

16

Dr. Williams did send the "updated" letter dated October 20, 2011 to the Board. The body of the letter, in its entirety, reads as follows:

"The intent of this letter is to state the support services for Roy Butler that will be made available to him through Maranatha Christian Center. Roy is/has a [good] support system which includes his mother Camille Gilmore, a member of Maranatha Christian Center. Maranatha has an Overcomer's Outreach Ministry, which is designed to support past substance abusers and a Men's Department, which is available to disciple men in various capacities.

"At this time, we are willing to provide these services, as well as spiritual support to Roy. We are looking forward to working with him to support and continue shaping and developing him as a productive individual of our community.

"If you have further questions, I can be reached at [telephone number]."

### The 2012 Parole Hearing and Decision

Butler's parole hearing was held on February 27, 2012, before Presiding Commissioner Peck, Commissioner Labahn, and Deputy Commissioner Lawin.

Butler told the Board that he became involved in the murder "because what I thought I was doing was helping a friend. Like I said before many times, from my immature decision making, a false sense of friendship . . . . At the time, I really didn't think it was wrong," and did not then believe it appropriate to go to police to handle Davis's abuse of Woods. "[T]he reality is I was influenced by my . . . social environment and my social peers." Butler told the Board that he "took the leadership role as far as the assault with the axe handle" on Davis, and he agreed with Himes that Davis should die, but his role in the actual murder was "[t]o just be there."

When Commissioner Lawin read the passage from Dr. Thacker's risk management analysis about "stressors or de-stabilizers" that Butler might encounter, and inquired "Any comments?" Butler responded "No."

Commissioner Labahn inquired: "So, . . . [t]ell us what you want to do when you're paroled?" Butler explained what he expected from the "assistance, employment, [and] programs" offered by Pastor Williams. He has a verbal offer of employment doing

17

"custodial . . . or janitorial work, also work with [the] youth department." His mother is 58 and lives by herself in a three-bedroom apartment. According to Butler, she is on total disability, has "lost her eyesight," and is in poor health with severe chronic arthritis. A cousin is her current caregiver, a position Butler plans to assume. He talks with his mother weekly on the telephone and feels very close to her. His grandmother is 79, also lives by herself, but still works at a bakery. "If anything happened to my mother or my grandmother, I have the support of Dr. Tony Williams and the congregation of the church," by which Butler presumably meant alternative housing. Butler has never met Dr. Williams in person; their only communication has been by letter and telephone.

When asked about "support letters," Butler identified only the 2005 letter from his grandmother and the two letters from Dr. Williams. Commissioner Peck then advised Butler that the Board was not inclined to give an expansive reading to the pastor's letters: "we're a firm believer that what people put in a letter is what they mean." "We don't read into [it] anything else." "[I]f Dr. Williams wanted to offer you residence, then he should have put it into the letter." "If he was going to offer you employment, he should have put it in the letter . . . ." Commissioner Labahn added that the pastor's letters "[do] not appear to be an offer of employment." Butler responded: "I didn't really think of it like that. I didn't think that . . . would be twisted like that."

Commissioner Peck then asked "if your grandmother has passed on and your mother is too ill to be able to welcome you into her home, and the church pastor accepts a position elsewhere, what's your plan B?" Butler's answer: "Well, I go to work. I have to do it. I have no choice but to do it, but to go out there, apply for work, get a job. I mean determination and my will to want to do the right thing will help me a whole lot."

Commissioner Peck returned to the subject of supporting letters. After Butler stated "I call and check on her [his mother] at least once a week," Commissioner Peck asked "Why didn't we get letters of support?" Butler responded: "Why I didn't get letters of support? Well, like I said, my mother doesn't write a lot but she figured I guess by offering her address or whatever, she figured . . . she could be called and it would be verified as far as her support."

18

The Board then allowed a deputy from the Alameda County District Attorney's Office to question Butler. The deputy also addressed the Board as to why Butler should not be given parole. Butler and his counsel also addressed the Board, which then recessed for deliberation.

Upon their return, Commissioner Peck told Butler that the panel concluded "the prisoner is not suitable for parole and would pose a current unreasonable risk of dangerousness to society if released from prison." He then spoke to how Butler should "put a little more effort" into explaining his insight into the life crime.

The other ground for the decision was Butler's parole plans, or more accurately, the persistent lack of them. "[W]e're concerned that this problem seems to keep on coming up in your hearings." "I think it's important that you do have a great relationship with your mom, but I don't know if it's great for you guys to all of a sudden to start living together. That may not have always worked out so well in the past with you. I know she's got some issues and maybe you feel some responsibility to take care of her, but you know the first responsibility that we have is to make sure you're going to be successful if we give you a date. That's our first responsibility is we want to see you be a success story because, if you're not a success story, that don't bode too well for us or any of the other lifers that are incarcerated because, believe me, every time somebody gets a date, they're under a microscope." "I'm seeing a pattern here that the same issues . . . keep on coming up with Panel after Panel . . . you're not fixing," that is, "your reentering society with . . . extremely limited support." The absence of support from his siblings also counted: "I don't care if she [a sister] lives in Florida. I want to know that if you have trouble out there, if adapting back to free society after all these years in a controlled environment I want to know that you can pick up the phone and you can call her, and that she's going to be able to help you through problems. I want to know that your brother in Sacramento who is close can help you out when you need it."

This point was reiterated by Commissioner Lawin: "I would just add in terms of the parole plans, your letters need to be very specific. [¶] . . . [¶] If Dr. Williams is going to offer you housing, he needs to say so, and if he's going to offer you a job, he needs to

19

say so . . . . [W]e can't assume anything, so they have to be very specific. [¶] . . . [¶] I'm going to give him a room free of charge or, you know, I'm going to give him an automobile. Whatever they're going to offer, they need to be specific."

Butler's petition for relief in habeas corpus was denied in the superior court, whereupon he commenced this original proceeding. We issued an order to show cause, and the parties filed a return and traverse. Subsequently, we asked for, and received, supplemental briefing regarding what remedy to apply if we concluded no evidence supported one of the Board's two reasons for parole denial and its decision did not reflect that it gave individualized consideration to all relevant facts and factors.

## DISCUSSION

### I. *The Law and the Standard of Review*

Recently, in *In re Morganti* (2012) 204 Cal.App.4th 904, 915-917 (*Morganti*), we began our analysis by distilling the "applicable rules that govern here" as collected in *In re Young* (2012) 204 Cal.App.4th 288, 300-304 (*Young*):

"*Shaputis* [*II, supra,*]) 53 Cal.4th 192, 'is the most recent of several opinions by our Supreme Court that together explain the framework that exists among our three branches of government regarding parole decisions. (See *Prather*, *supra*, 50 Cal.4th 238; . . . *Lawrence,* [*supra,*] 44 Cal.4th 1181; . . . *In re Shaputis* (2008) 44 Cal.4th 1241 (*Shaputis I*); . . . *Dannenberg*[, *supra,*] 34 Cal.4th 1061; . . . *In re Rosenkrantz* (2002) 29 Cal.4th 616 (*Rosenkrantz*).) As they explain, the Board's parole authority is governed by a body of statutes and regulations as mandated by the Legislature, most notably Penal Code section 3041 (section 3041) and title 15, section 2402 of the California Code of Regulations. . . . (*Shaputis II,* at p. 209, fn. 5; *Prather,* at pp. 249-251; *Lawrence,* at pp. 1201-1203.) . . .

" ' "Section 3041 mandates that the Board " ' "normally" ' " set a parole date for an eligible inmate, and " 'must' " do so unless it determines that an inmate poses a current threat to public safety. (*Prather, supra,* 50 Cal.4th at p. 249, quoting *Lawrence*, *supra*, 44 Cal.4th at p. 1202.) . . . As a result, parole applicants have a "due process liberty interest in parole" and " 'an expectation that they will be granted parole unless the Board

20

finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' " (*Lawrence*, . . . at pp. 1191, 1204.) In other words, " 'parole is the rule, rather than the exception' " (*id.* at p. 1204, quoting *Smith*[, *supra*,] 114 Cal.App.4th [at p.] 366), and "the onus [is] on the Board to justify denial of parole . . ." (*Shaputis II, supra,* 53 Cal.4th at p. 222 (conc. opn. of Liu, J.)).

" 'Accordingly, as we have discussed, the Board must determine, consistent with due process, the "essential question" of "whether the inmate currently poses a threat to public safety." (*Shaputis II, supra,* 53 Cal.4th at pp. 209, 220.) The Board answers this question by conducting "an individualized inquiry" into the inmate's suitability for parole (*id.* at p. 219), "draw[ing] . . . answers from the *entire* record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*Id.* at p. 221, italics added.) It is required to give due consideration to the criteria referred to in section 3041 and, more specifically, in [California Code of] Regulations, [title 15,] section 2402, promulgated by the Board pursuant to legislative mandate. . . . (*Prather, supra,* 50 Cal.4th at p. 251 [Board "*must* consider the statutory factors concerning parole suitability set forth in section 3041, as well as the Board regulations" (italics added)].)

" '[California Code of] Regulations, [title 15,] section 2402 contains numerous factors regarding both an inmate's unsuitability . . . and suitability . . . for parole that the Board must consider and rely on to assess whether the inmate poses "an unreasonable risk of danger to society if released from prison." ([Cal. Code] Regs., [tit. 15,] § 2402, subds. (a), (c), (d).) These "matrix of factors . . . contemplates that even those who committed aggravated murder may be paroled after serving a sufficiently long term if the Board determines that evidence of post-conviction rehabilitation indicates they no longer pose a threat to public safety." (*Lawrence, supra,* 44 Cal.4th at p. 1211.)

" 'We review the Board's decision under a "highly deferential 'some evidence' standard." (*Shaputis II, supra,* 53 Cal.4th. at p. 221.) . . . The *Shaputis II* opinion states that the Board's decision "is upheld unless it is arbitrary or procedurally flawed."

([*Ibid*].)  It does not specifically define what is meant by "procedurally flawed."
Elsewhere, however, it states that "[u]nder the 'some evidence' standard of review, the
parole authority's interpretation of the evidence must be upheld if it is reasonable, in the
sense that it is not arbitrary, and reflects due consideration of the relevant factors."  (*Id.* at
p. 212.) . . .

" 'More specifically, although " 'the precise manner in which the specified factors
relevant to parole suitability are considered and balanced' " lies with the Board (*Shaputis
II, supra,* 53 Cal.4th at p. 210, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 677), its
decision " '*must reflect an individualized consideration of the specified criteria. . . .*' "
(*Lawrence, supra,* 44 Cal.4th at p. 1232, quoting *Rosenkrantz,* at p. 677, italics
added). . . .  "It is not the existence or nonexistence of suitability or unsuitability factors
that forms the crux of the parole decision; *the significant circumstance is how those
factors interrelate* to support a conclusion of *current* dangerousness to the public."
(*Lawrence,* at p. 1212, italics added.)  The Board "must determine whether a particular
fact is probative of the central issue of current dangerousness when considered in light of
the *full* record."  (*Prather, supra,* 50 Cal.4th at p. 255, italics added.)

" ' " 'As long as the . . . decision reflects due consideration of the specified factors
as applied to the individual prisoner in accordance with applicable legal standards, the
court's review is limited to ascertaining whether there is some evidence in the record that
supports the . . . decision.' " (*Shaputis II, supra,* 53 Cal.4th at p. 210, quoting
*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)  We are to ensure that the Board's "analysis of
the public safety risk entailed in a grant of parole is based on a modicum of evidence, not
mere guesswork."  (*Shaputis II,* at p. 219.)  We review not only the evidence specified by
the Board, but the entire record to determine whether this modicum of evidence exists,
. . . and look for "a rational nexus between the evidence and the ultimate determination of
current dangerousness."  (*Shaputis II,* at p. 221.)  We do not reweigh the evidence.
(*Ibid.*)' " (*Morganti*, *supra*, 204 Cal.App.4th at pp. 915-917, fns. omitted.)

With these standards in mind, we review of the Board's decision.

22

## II. *There is No Evidence of Lack of Insight*

The Board's first reason for denying parole was Butler's purported lack of insight into his life crime. More particularly, the Board cited his failure to adequately articulate to the Board the insights it was sure he *had* achieved. The Board's reliance on this purported lack of insight was improper.

The record is full of evidence that Butler had good insight into the life crime. As indicated by our review of the record above, the five psychologists who evaluated Butler from 1991 to 2011 reported they were satisfied that he had gained, and expressed, sufficient insights into his life crime. The latest psychologist to interview Butler, Dr. Thacker, reported that since 1988, he had repeatedly, consistently taken responsibility and expressed remorse for the crime. Dr. Thacker thought Butler "appeared to accept his role in the life crime," did not minimize it, and, when he worked with correctional officers rather than engage in inappropriate tasks at the urging of a group of prisoners, demonstrated "a change of his mindset toward authorities."

Dr. Thacker also concluded Butler had "spent time and energy exploring and attempting to understand the motivating factors in the crime," and had "developed good insight" into them. Butler discussed "his immaturity and ignorance as factors influencing his involvement in the crime" and, "[w]hen asked what factors would help keep him out of trouble in the future, he responded 'the way I think now . . . more productive, positive . . . not dysfunctional . . . mature . . . I set goals and surround myself with people doing the same thing . . . my maturity." Dr. Thacker wrote that Butler's "good insight" into the motivating factors in the crime "included his tendency to go along with other people and his general level of immaturity, his association with antisocially minded individuals, his antisocial mindset in this situation . . . , as well as his antisocial mindset which included believing that police were not helpful and, in fact could be harmful . . . ."

Further, the parties have stipulated as part of the settlement that "in a comprehensive risk assessment of petitioner, dated September 26, 2011, Dr. S. Thacker concluded that 'Butler presented with good insight into his past criminal/violent behavior.' "

Consistent with Dr. Thacker's observations, Butler extensively discussed his responsibility and remorse for the crime during the February 2012 Board hearing. Our review of the entire record discloses no evidence of a lack of insight.

Lack of insight may, in an appropriate case, support a panel's decision of current dangerousness. (*Shaputis II, supra*, 53 Cal.4th at p. 221.) However, the Board's decision does not indicate that it considered any of this evidence. Indeed, its decision indicates it did *not* actually conclude that he lacked insight, but instead merely wanted him to further articulate it. Presiding Commissioner Peck stated about Butler's insight into why he committed the crime: "I'm *sure you recognize it*, but I would have liked not only for you to recognize it but to articulate it." (Italics added.) The Board's reasoning is baffling.[9] There is no basis in law for denying parole because of a less than perfect articulation of insight that a prisoner has unquestionably achieved. The Board acted improperly when it relied on lack of insight to deny Butler parole because no evidence supported this ground.

We are left, then, with the task of determining what remedy is appropriate when the first of only two reasons stated by the Board for the denial of parole is unsupported by evidence.

## II. *Remedy*

Under the particular circumstances of this case and guided by precedent, we conclude that we must grant the petition and remand the matter to the Board for further proceedings because it is unclear the Board would have denied Butler parole based on its proper consideration of his parole plans alone, after due consideration of all relevant facts and factors.

### A. *The Relevant Law*

The California Supreme Court has indicated that courts "may uphold the parole authority's decision, despite a flaw in its findings, *if the authority has made clear* it

___

[9] In *Young,* we noted that, "as Justice Liu points out in his concurrence in *Shaputis II*, we 'examine[] the *rationality* of the parole authority's decision, an inquiry that properly focuses on the authority's reasoning, including the evidence cited by the authority in support of its reasoning.' " (*Young*, *supra*, 204 Cal.App.4th at p. 304, fn. 13, quoting *Shaputis II*, *supra*, 53 Cal.4th at p. 225 (conc. opn. of Liu, J.).)

24

would have reached the same decision even absent the error." (*Dannenberg*, *supra*, 34 Cal.4th at p. 1100, italics added.) Consistent with this approach, several appellate courts have determined that, when one of the reasons for parole denial was not supported by some evidence and they could not determine what parole decisions would have otherwise been made, they had no choice but to grant the petitions before them and remand for further proceedings. The reasoning of these opinions includes the recognition that, as our Supreme Court has repeatedly instructed, parole cannot be denied without a consideration of the interrelationship of all relevant facts and factors. (*Shaputis II*, *supra*, 53 Cal.4th at p. 225; *Prather*, *supra*, 50 Cal.4th at p. 255; *Lawrence*, *supra*, 44 Cal.4th at p. 1212.)

In *Criscione II*, *supra*, 180 Cal.App.4th 1446, the Sixth Appellate District summarized its holding in a prior case involving the same petitioner, *In re Criscione* (2009) 173 Cal.App.4th 60 (*Criscione I*). The court stated that, because the Board "did not clearly indicate that it had considered the relationship between the factors outlined in its decision and its conclusion that Criscione would present an unreasonable risk to public safety if released" and relied on some factors for which there was a lack of evidence or relevance, and because the court could not determine whether the Board would have reached the same conclusion "solely upon the factors that remained," "the appropriate remedy was to remand with directions to the Board to reconsider the prisoner's parole suitability 'in accordance with the discretion allowed by law.' " (*Criscione II*, at p. 1461.)

The *Criscione* court relied on *DeLuna, supra*, 126 Cal.App.4th 585, also by the Sixth Appellate District. (*Criscione II*, *supra*, 180 Cal.App.4th at p. 1461.) The *DeLuna* court found that "the majority" of the Board's stated reasons for denying a parole release date lacked any evidentiary support. (*DeLuna*, at p. 598.) The court continued: "[T]he 'decision cannot stand' when findings on important factors lack evidentiary support and it is not clear that the Board would have reached the same conclusion based on the supported factors. (Cf. *Smith*[, *supra*,] 114 Cal.App.4th [at p.] 373.) When the supported factors could justify denying parole, but it is not clear that the Board would have reached this conclusion, we concluded in [*Smith*], at pages 373-374, that the

25

appropriate remedy is to direct the Board to reconsider the prisoner's parole suitability in accordance with the discretion allowed by law." (*Ibid*.) Accordingly, the court found the trial court's order remanding the case to the Board with directions to proceed in accordance with due process was appropriate. (*Ibid*.)

In *Smith,* the case relied on by the *DeLuna* court, the Sixth Appellate District reviewed a Governor's decision to reverse a Board grant of parole. The *Smith* court concluded, "there is no evidence to support some of the factors on which the Governor based his determination." (*Smith*, *supra*, 114 Cal.App.4th at p. 374.) The *Smith* court, relying on *Capistran, supra*, 107 Cal.App.4th 1299, ordered that the trial court direct the Governor to vacate his decision reversing the Board, reinstating the Board's grant of parole, which the Governor, "at his discretion, may review . . . and issue a new determination under his constitutional and statutory authority and in accordance with the requirements of due process." (*Smith*, at pp. 374-375.)

Finally, in *Capistran*, the case relied on by the *Smith* court, the Second Appellate District also considered a Governor's reversal of a Board's grant of parole, which the Governor based on not only the undisputed nature of the offense, but also aspects of his institutional behavior which, the *Capistran* court concluded, were not supported by some evidence. (*Capistran*, *supra*, 107 Cal.App.4th at p. 1306.) The court concluded that, "[b]ecause the Governor's decision purports to rely on facts regarding Capistran's institutional behavior that are not supported by some evidence, the decision cannot be sustained on the ground that the other aspects of the Governor's decision are supported by some evidence." (*Ibid*.) The court also noted that the Governor, while his decision was required to reflect individualized consideration of all the factors relevant to parole suitability, made no mention of certain relevant suitability factors. (*Ibid*.) The court, rejecting the view that Capistran was entitled to be released on parole, concluded, based on its reading of *In re Rosenkrantz* (2002) 29 Cal.4th 616, 658-662, that in such a circumstance, the Board or Governor should be ordered to vacate a decision denying parole " 'and thereafter to proceed in accordance with due process of law.' " (*Capistran*, at pp. 1306-1307.) Accordingly, it implemented the same remedy as that used by the

26

*Smith* court, ordering the Governor's decision be vacated, the Board's reinstated, and recognized that the Governor could thereafter proceed to issue a new decision in accordance with due process of law.  (*Capistran*, at p. 1307.)

**B.  *Analysis***

We conclude that we must follow this precedent, if only because the absence of any evidence of lack of insight makes it unclear that the Board would have denied Butler parole based solely on its remaining reason for denial, its conclusion that he lacked sufficient parole plans.  Three other aspects of the Board's decision inform this conclusion.

**1.  *The Board Directly Related Concerns About Parole Plans to Its Improper Lack of Insight Analysis***

In its statement of decision, the Board directly related its concern about Butler's lack of sufficient parole plans to its concerns about his insight.  In discussing those plans, Presiding Commissioner Peck stated:

"What do you think is going to make you most successful?  Because believe me, we got some ideas what might make you most successful, but we want you to see it because *that's all part of the insight*.  That's all part of understanding how you're going to be successful because remember something, before you came to prison, you weren't making the best decisions, and we want to make sure that you know how to make the best decisions now to keep yourself out of trouble."  (Italics added.)

Because the Board indicated here that its second reason for denying parole was directly related to Butler's lack of insight, for which there was no evidence, it is especially unclear that the Board would have denied parole based solely on its conclusion that Butler lacked sufficient parole plans.

**2.  *The Board's Decision Does Not Reflect Individualized Consideration of all the Relevant Facts and Factors***

Furthermore, the Board's decision is required to, but does not, "reflect an individualized consideration" of all relevant suitability and unsuitability factors.  (*Lawrence*, *supra*, 44 Cal.4th at p. 1232; *Morganti*, *supra*, 204 Cal.App.4th at pp. 915-

27

917; *Young*, *supra*, 204 Cal.App.4th at pp. 300-304.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public." (*Lawrence,* at p. 1212, italics added.) Rather than reflect such individualized consideration, the Board in its decision focused entirely on its two grounds for unsuitability and disregarded the remainder of the relevant facts and factors, virtually all of which pointed to Butler's suitability for parole. This is insufficient. Just as importantly, we do not have the benefit of the Board's evaluation of all the relevant factors, making it particularly unclear whether it would have denied parole based on its parole plan concerns alone.

Our review of the Board's decision as stated in the reporter's transcript is an important part of our due process review. "[T]he Board must provide a definitive written statement of its reasons for denying parole." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 655, citing *In re Sturm* (1974) 11 Cal.3d 258, 273 (*Sturm*).) In his concurrence in *Prather*, Justice Moreno discussed the development of this rule and *Sturm*. He wrote, "This requirement followed from the principle that a prisoner has the right to be ' "duly considered" ' for parole and not to be denied parole arbitrarily, and that such rights 'cannot exist in any practical sense unless there also exists a remedy against their abrogation.' ([*Sturm*,] at p. 268.) A definitive written statement of reasons was necessary to guarantee that such an effective remedy exists, because, inter alia, it will help to ensure 'an adequate basis for judicial review.' (*Id*. at p. 272.) It is important that *Sturm* be taken at its words, and that the Board be required to issue a *definitive* written statement of reasons." (*Prather*, *supra*, 50 Cal.4th at p. 260 (conc. opn. of Moreno, J.).)

Furthermore, "[a]s *Lawrence* clarified, . . . due consideration 'requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness.' " (*Criscione I*, *supra*, 173 Cal.App.4th at pp. 74-75, quoting *Lawrence, supra,* 44 Cal.4th at p. 1210.)

28

Presiding Commissioner Peck began his announcement of the panel's decision by stating, "The Panel has reviewed all information that was before us today in concluding the prisoner is not suitable for parole and would pose a current unreasonable risk of dangerousness to society if released from prison. The finding is based on weighing the considerations provided in the California Code of Regulations, title 15." He then discussed only "a couple of things that concerned us," namely Butler's purported lack of insight and sufficient parole plans. Not a word was spoken regarding any of the six factors tending to indicate unsuitability or the nine circumstances tending to indicate suitability that are identified in section 2402, subdivision (d)(8) of title 15 of the California Code of Regulations.[10]

Many of these suitability factors were unquestionably relevant to the Board's evaluation of Butler's current dangerousness, or lack thereof. There can be no dispute that Butler did not have a significant juvenile record, showed signs of remorse, lacked any significant history of violent crime, had realistic parole plans, had marketable skills, and had engaged in institutional activities that indicated an enhanced ability to function

---

[10] Numerous unsuitability and suitability factors are stated in the California Code of Regulations. Unsuitability factors are a commitment offense carried out in an "especially heinous, atrocious or cruel manner," including because there were "[m]ultiple victims," the offense was carried out in a "dispassionate and calculated manner," the victim was "abused, defiled or mutilated," the offense was carried out "in a manner demonstrating an exceptionally callous disregard for human suffering," or the motive for the crime was "inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(A)-(E).) Other unsuitability factors are a previous history of violence or of committing sadistic sexual offenses; "a history of unstable or tumultuous relationships with others"; sadistic sexual offenses; "a lengthy history of severe mental problems related to the offense"; and "serious misconduct in prison or jail." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2)-(6).)

Suitability factors are the absence of a juvenile record; "reasonably stable relationships with others"; signs of remorse; a crime committed "as the result of significant stress in [the prisoner's] life"; Battered Woman Syndrome; the lack of "any significant history of violent crime"; the prisoner's age reduces the probability of recidivism; realistic plans for release or marketable skills that can be put to use upon release; and institutional activities that "indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(1)-(9).)

within the law upon release.  (Cal. Code Regs., tit. 15, § 2402, subd. (d)(1), (3), (6)-(9).)

Indeed, while the regulations make clear that all of the factors are "general guidelines,"

apart from his involvement in the commitment offense Butler has had no association with

violence either before he was arrested in 1987 for this crime or in the more than 24 years

that he has been incarcerated.[11]  Yet the Board's decision is silent on these matters,

thereby failing to reflect that it considered the interrelationship of all relevant facts and

factors.

The Board's pro forma references to the record and the California Code of

Regulations are woefully inadequate to establish that it gave individualized consideration

to all relevant facts and factors.  As we explained in *In re Moses* (2010) 182 Cal.App.4th

1279, "*Lawrence* makes clear that our 'judicial review must be sufficiently robust to

reveal and remedy any evident deprivation of constitutional rights.  If simply pointing to

the existence of an unsuitability factor and then acknowledging the existence of

suitability factors were sufficient to establish that a parole decision was not arbitrary, and

that it was supported by "some evidence," a reviewing court would be forced to affirm

any denial-of-parole decision linked to the mere existence of certain facts in the record,

even if those facts have no bearing on the paramount statutory inquiry.  Such a standard,

because it would leave potentially arbitrary decisions of the Board or the Governor intact,

would be incompatible with our recognition that an inmate's right to due process "cannot

---

[11] It is important to note that Butler's constitutional claims, which the parties have settled in case No. A139411, are based upon the Board's practice of not setting parole dates until after determining inmates' suitability for parole.  In Butler's case, the maximum base term for the most heinous second degree murders that can be derived from the Board's regulations is 21 years.  (Cal. Code Regs., tit. 15, § 2403, subd. (c).) Butler's counsel has used the matrix in the regulations and the record in Butler's case to suggest that his base term should be set at 16, 17, or 18 years.  But even if the Board were to determine that 21 years is appropriate, Butler had already been imprisoned for about 23 and a half years at the time of his last hearing, and now, including the year before he was sentenced and almost another year since the last Board hearing, for a total of approximately 25 and a half years.

exist in any practical sense without a remedy against its abrogation." ' " (*Moses*, at pp. 1312-1313, quoting *Lawrence*, *supra*, 44 Cal.4th at pp. 1211-1212.)[12]

The dangers to due process involved in the Board's failure is apparent in its discussion of the only two issues it did discuss, Butler's purported lack of insight and his insufficient parole plans. We have already discussed the Board's disregard of a record full of evidence of Butler's insight. The Board's parole plans analysis is also flawed by a failure to consider all relevant facts and factors.

Whether "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release" is one of the circumstances that "tend to show the prisoner is *suitable* for release." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8), italics added.) In announcing the Board's decision, Presiding Commissioner Peck acknowledged Butler's "marketable skills." This, along with Butler's parole plans,

---

[12] Our dissenting colleague's analysis focuses almost entirely on the "some evidence" portion of our due process review, and gives little attention to the requirement that we also determine if the Board's decision reflects due consideration of all relevant facts and factors. For example, he characterizes "the issue before us" as whether there is "any evidence in the record that supports the Board's decision." (Dis. opn. of Richman, J. at p. 10, *post*.) There are two problems with this approach. First, it does not take into account that the Board's failure to address all relevant factors makes it particularly unclear whether it would have denied parole based only on its parole plan concerns. This lack of clarity alone requires remand here.

Second, it does not fully comport with our Supreme Court's directive that we, as part of our determination of whether some evidence of current dangerousness supports the Board's decision, must determine if the Board's " 'decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable standards[.]' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 210, quoting *Rosencrantz*, *supra*, 29 Cal.4th at p. 677.) This division recently and unanimously acknowledged this duty in *Morganti*. Quoting favorably from *Young*, *supra*, 204 Cal.App.4th at page 304, also by this division, the court reiterated: " '[W]e are to review the Board's decision to ensure that it satisfies *two due process imperatives*," one of which is "*whether the Board's decision reflects due consideration of all relevant statutory factors . . . .*' " (*Morganti*, *supra*, 204 Cal.App.4th at p. 917, italics added.) Our colleague contends that we are adding a new "level of burden" on the Board by requiring that its decision reflect consideration of all relevant factors. (Dis. opn., p. 31.) To the contrary, we are again following our Supreme Court's lead.

31

characterized by Dr. Thacker as "generally realistic and feasible," which included living with his mother and becoming a part of an active church community led by a pastor who would help him obtain work and spiritual support, appear to be grounds for finding Butler *more suitable* for parole. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) As our colleagues in Division Three of this district stated in a recent case, *In re Powell* (2010) 188 Cal.App.4th 1530 (*Powell*), "the Board should consider whether '[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.' (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) To qualify as 'realistic' a plan need not be ironclad. [Citation.] Indeed, the regulation simply requires 'realistic plans for release' *or* 'marketable skills.' " (*Powell*, at p. 1543.) Nonetheless, the Board converted this suitability factor into an unsuitability factor, even though insufficient parole plans is not listed as one.[13] (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)-6.)

In any event, the Board's failure to demonstrate that it gave individualized consideration to all relevant facts and factors makes it particularly unclear what the Board would have decided based on its parole plan concerns alone, and is an additional reason to grant Butler's petition. (*Criscione II*, *supra*, 180 Cal.App.4th at p. 1461; *Capistran*, *supra*, 107 Cal.App.4th at p. 1306.)

### 3. *The Board's Parole Plans Analysis is Flawed*

Finally, the Board's parole plans analysis is flawed in three other respects.

First, the Board's stated concerns about Butler's parole plans focused on whether or not he would be a "success" on parole. As we have discussed, Presiding Commissioner Peck told him the Board's "first responsibility" was "to see you be a success story because, if you're not a success story, that don't bode too well for us or any

---

[13] Our dissenting colleague points out that in a number of other cases, we have discussed other inmates' impressive parole plans at great length, and asks, "Why would we have done that if the adequacy of the inmate's plans did not bear significantly on the only issue before us in those cases—current dangerousness?" (Dis. opn., p. 4.) A review of those decisions makes clear this court did so as part of a review of the Board's obligation to consider all facts and factors relevant to the particular circumstances of each of those cases.

of the other lifers that are incarcerated because, believe me, every time somebody gets a date they're under a microscope."

The Board's focus on the likelihood of Butler's "success" and its significance to the reputation of the Board and other life prisoners misses the purpose of its inquiry entirely. "The essential question in deciding whether to grant parole is whether the inmate *currently poses a threat to public safety*." (*Shaputis II*, *supra*, 53 Cal.4th at p. 220, italics added.) The Board's discussion of Butler's "success" did not include any rational nexus to current dangerousness, other than the Board's improper reliance on Butler's purported lack of insight, and we have not found one in the record.[14]

This is not to say that the Board's desire to maximize the likelihood of a "successful parole" is inappropriate. As our colleagues in Division Three said in *Powell, supra*, 188 Cal.App.4th at p. 1543 about exactly such a desire, "The Board may address that concern using its power to set reasonable parole conditions. (Pen. Code, §§ 3052-3053; [citation].) It may condition . . . parole on a suitable transitional placement or attending a substance abuse group closer to his future residence. Furthermore, after a life-term prisoner is given a parole date, a parole agent investigates the individual's plans confirming, inter alia, the inmate's proposed residence. (Dept. of Corrections and Rehabilitation, Operations Manual [Jan. 2010] Adult Parole Operations, § 81010.5.1, pp. 668–669.) The agent determines whether a proposed program is suitable. If the plan is unsuitable, the parole agent must try to develop 'an appropriate alternate program.' (*Id.*, § 81.010.5, p. 668.) Thus, the Board may oversee . . . parole plans and ensure that [a prisoner] is put into an appropriate placement without denying parole."

---

[14] Indeed, Presiding Commissioner Peck's comments suggest he thought Butler was *not* currently dangerous. He told Butler, "I don't think you're going to have a problem with disciplinaries." Then, after referring to Butler's working with correctional officers rather than engage in inappropriate tasks at the urging of a group of prisoners, said, "You're making the right choices. Gosh darn it, you're doing—you're doing—that was very good. And I just want to see you continue to keep on making those good choices. I do. And I want to see you be a success story."

33

In addition, California Code of Regulations specifically provide that parole may be revoked and a parolee returned to prison if the parolee violates general conditions of parole. (Cal. Code Regs., tit. 15, § 2512.) These include the requirements that the parolee report his or her residence, and any change of residence, to a parole agent in advance; and report a change of employment location, employer, or termination of employment within 72 hours of these events. (Cal. Code Regs., tit. 15, § 2512, subd. (a)(2).) The Board can also impose special conditions of parole. (Cal. Code Regs., tit. 15, § 2513.) These include the requirements that a parolee participate in psychiatric treatment, maintain a residence approved in writing by the parole department, and any other condition the Board deems necessary due to unusual circumstances, whenever warranted by unusual circumstances. (*Id*. subds. (a), (d), (g).)

Given the Board's obligation to consider all relevant facts and factors, and its particular concerns about Butler's parole plans, it is inexplicable that its decision did not reflect a consideration of its discretionary authority to place conditions on Butler's parole, and explain why exercise of it would not satisfy the Board's concerns.

Second, the Board's concerns about Butler's parole plans focused significantly on the lack of verification of support from his family, such as a current letter from his mother stating that he could live with her. We have not found legal support for the proposition that unverified parole plans are *alone* a ground for denying parole. Again, as our colleagues stated in *Powell*, "To qualify as 'realistic' a plan need not be ironclad. [Citation.] Indeed, the regulation simply requires 'realistic plans for release' *or* 'marketable skills . . . .' " (*Powell, supra*, 188 Cal.App.4th at p. 1543.) As we have discussed, the Board and parole department also have the authority to set and enforce parole conditions that include the advance approval or disapproval, and closely monitoring, of a parolee's residence choices, and set whatever special conditions are merited by unusual circumstances. (Cal. Code Regs., tit. 15, §§ 2512, subd. (a)(2); 2513, subds. (d), (g).)

This is not to say that inadequate parole plans alone can never constitute some evidence of current dangerousness warranting a denial of parole.[15] Respondent asserts that one case approved of a parole denial "even when every other factor in the record point[ed] towards a finding of suitability." *In re Cerny* (2009) 178 Cal.App.4th 1303 (*Cerny*).[16] *Cerny* was also decided by our colleagues in Division Three, prior to *Powell*. The relevant circumstances of *Cerny* are very different from those here.

Cerny petitioned for relief from the Board's two most recent denials of parole. A chronic drug user, he had committed a second degree murder using a firearm in a $60 heroin deal gone awry. (*Cerny*, *supra*, 178 Cal.App.4th at pp. 1305, 1306-1307.) The most recent Board decision denied parole on one ground, Cerny's lack of definite parole plans.[17] The Board, while concerned about the lack of substantiation that Cerny had sufficient funds and a place to stay (*id*. at p. 1308.), had as its " 'biggest issue' " the possibility that Cerny would relapse into using drugs. It found Cerny did not sufficiently reach out to postrelease drug rehabilitation programs because none promised to provide him with housing or employment. (*Id*. at pp. 1308-1309.)

Division Three concluded that, "*In light of Cerny's extensive history of drug abuse and dependence*, the Board's concern about his uncertain plans for parole was justified" (*Cerny*, *supra*, 178 Cal.App.4th at p. 1306, italics added), regardless of the suitability factor regarding realistic parole plans or marketable skills. (*Id*. at pp. 1314-1315.)

---

[15] We are mindful, however, that, "even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense" because "[s]uch excessive confinement . . . violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution." (*Dannenberg*, *supra*, 34 Cal.4th at p. 1096.)

[16] Respondent cites, but does not discuss, two other cases as providing legal authority for the proposition that a lack of parole plans can constitute some evidence of current dangerousness, *In re Shippman* (2010) 185 Cal.App.4th 446 and *In re Honesto* (2005) 130 Cal.App.4th 81. These cases arose on records in which the Board had many reasons for denying parole of which "marginal plans" (*Shippman*, at p. 474) was only one and only mentioned in passing.

[17] The previous denial was based on additional grounds. (*Cerny*, *supra*, 178 Cal.App.4th at pp. 1305, 1307-1308.)

35

Specifically, the court held, "the Board's concerns that Cerny could relapse into drug abuse if he is released without firm and verifiable plans to treat his addiction are valid." (*Id*. at p. 1315.) In other words, the court found the Board's concerns about Cerny's parole plans were valid because of his extensive history of chronic drug abuse, which had a direct nexus to the homicide Cerny had committed and required continuing treatment and monitoring.

The important difference between *Cerny* and this case is the absence of any such nexus. We have concluded that Butler does not lack insight. Also, he does not have any history of substance abuse, nor does the Board's decision or the record indicate that he requires any specialized postrelease program treatment rationally related to a possible threat to public safety.

Our dissenting colleague points to evidence in the record that the Board and psychological evaluators have expressed concerns for some time about Butler's failure to provide detailed and verified parole plans, despite his assurances that he would attend to these matters, and notes that the Board said in its decision that it saw a "pattern" that Butler was "not fixing." (Dis. opn., p. 15.) We need not, and do not, determine if *any* aspect of the Board's parole plan analysis could be some evidence of current dangerousness in light of our conclusion that we must vacate and remand because it is unclear what the Board would have decided if it had complied with all due process requirements.[18]

---

[18] Again, we do not preclude the possibility that, in the proper circumstances, the Board could conclude an inmate's lack of parole plans are an indication of current dangerousness, such as in *Cerny*. Nonetheless, whether or not that is the case here regarding any aspect of the Board's concerns about Butler's parole plans—an issue we do not determine—our dissenting colleague does not disagree that we have a duty to vacate the Board's decision and remand the matter when it is not clear that the Board would have reached the same decision without its improper lack of insight analysis, not to mention the other due process defects in its decision. Nor does respondent. Instead, our colleague believes it is clear the Board would have denied parole on a proper consideration of Butler's parole plans alone and, therefore, we should deny the petition. On this point—which respondent does not argue—we respectfully disagree.

36

That said, once we take into account that Butler did show good insight into the reasons he committed the life crime—including, as Dr. Thacker emphasized, good insights about his immaturity and association with antisocially minded individuals when he was a young man—we are hard-pressed to find a rational nexus between the Board's concerns about Butler's insufficient parole plans and Butler's current dangerousness, particularly when these plans are considered as they interrelate with all relevant facts and factors. For example, our dissenting colleague quotes extensively from elsewhere in Dr. Thacker's evaluation, where Dr. Thacker indicated, and some of the Board's discussion suggests, a concern that Butler may in the future need community resources to address PTSD and depression stemming from him being accidentally shot in prison. Nothing in the record indicates these issues, now satisfactorily resolved, make Butler currently dangerous. It would be improper for the Board to deny Butler parole for failure to pursue postrelease resources regarding these symptoms in the absence of such a rational nexus, or based on speculation about his possible future needs. For these reasons, Dr. Thacker's conclusion that Butler poses a low to moderate risk for violence in the free community is of dubious evidentiary value, since it rests in significant part on these symptoms and Butler's possible need for future treatment of them.

Third, the Board's concerns about Butler's parole plans relied significantly on improper speculation. A Board's "conclusion that a life prisoner is currently dangerous and therefore should be denied parole 'must be supported by some *evidence*, not merely by a hunch or intuition.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 228, quoting *Lawrence*, *supra*, 44 Cal.4th at p. 1213.) Presiding Commissioner Peck said about the lack of a current letter of support from Butler's family that, although he did not know why there was no letter, "there must be a problem." He also said he did not know if it was "great" for Butler to live with his mother because, although Butler had a "great relationship" with her, living with his mother "may not have always worked out so well in the past with you." However, the record indicates Butler only lived with his mother for one year, when he was 17, years before he committed the life crime. The Board did not find, and we have found no evidence in our review of the record, that doing so had anything to do with

his life crime, or that Butler living with his mother upon release would create a threat to public safety. The Board should refrain from relying on such unsubstantiated hunches.

### 4. *The Appropriate Remedy*

For all of these reasons, we conclude that we must employ the same remedy utilized in *Criscione II*, *supra*, 180 Cal.App.4th at page 1461, *DeLuna*, *supra*, 126 Cal.App.4th at page 598, *Smith*, *supra*, 114 Cal.App.4th at page 373, and *Capistran*, *supra*, 107 Cal.App.4th at pages 1306-1307. Because the Board's decision (1) reflected its consideration of only two unsuitability factors, the first of which was not supported by any evidence and the second of which relied significantly on the first; (2) did not reflect the Board's consideration of all relevant facts and factors; and (3) included a flawed analysis of the sufficiency of Butler's parole plans, we cannot say that, had the Board appreciated the deficiencies in its decision, it clearly would have denied a parole date based on the state of his parole plans alone. To the contrary, given all of the suitability factors that weighed in Butler's favor and the absence of *any* regulatory unsuitability factors, including his long history without violence and his having already then served 23 and a half years for a crime whose base term might be as low as 16 years, and certainly no more than 21 years, we doubt that it would have. Accordingly, we grant the petition, vacate the Board's decision, and order the Board to conduct a new parole-suitability hearing in accordance with due process of law.

## DISPOSITION

Petitioner Roy Butler's supplemental petition for writ of habeas corpus is GRANTED. The Board of Parole Hearings is directed to vacate its February 27, 2012 parole decision and, consistent with the settlement agreement, to hold a new hearing and issue a new decision within 60 days of this order. The Board shall proceed in accordance with due process of law in light of this opinion.

_____
Brick, J.*

I concur:

_____
Kline, P.J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Dissenting opinion of Richman, J.

I agree with the majority that there is not some evidence that Butler lacked insight. I also agree generally with the majority's description of the commitment offense and with its recitation of some of Butler's prior parole history, as far as the recitation goes. Beyond that, I disagree fundamentally with the majority's view of the record—and, most fundamentally with its perception of our role. I thus dissent.

**Background and Introduction**

The majority refers to another case, now settled, which arose out of Butler's petition attacking as unconstitutional the Board's practice of deferring calculation of the base term for life inmates until after a finding of suitability for parole. (Maj. opn., p. 1, fn. 1.) That petition was filed by Butler *in pro per*, and it did not contend that there was not some evidence supporting the Board's denial of parole. We appointed very able counsel to represent Butler on his constitutional claim, and they filed an 83-page supplemental petition, including for the first time the "not some evidence" argument. Remarkably, nowhere in the lengthy petition did counsel make the argument at the heart of the majority opinion: "when the Board has denied parole for two reasons, one of which is not supported by some evidence of current dangerousness, and we cannot determine whether the Board would have denied parole for the remaining reason stated, we must grant the petition, vacate the Board's decision, and remand for further Board proceedings. (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1461 (*Criscione*); *In re DeLuna* (2005) 126 Cal.App.4th 585, 598 (*DeLuna*); *In re Smith* (2003) 114 Cal.App.4th 343, 373 (*Smith*); *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306-1307 (*Capistran*).)" (Maj. opn., p. 2.) No less remarkably, the petition did not even cite, much less rely on, any of the four decisions the majority finds controlling.

Regardless, the majority holds as it does, in the course of which it dismisses out of hand the express statement by the Presiding Commissioner that the "finding of unsuitability is based on weighing the considerations provided in the California Code of Regulations, Title 15." Moreover, the majority seizes on a brief compliment by the

1

Presiding Commissioner ("You have marketable skills")—four words in a 12-page decision—to suggest that this single remark shows grounds "for finding Butler *more suitable* for parole." (Maj. opn., p. 32.) Indeed, the majority focuses on another stray statement—whether or not Butler would be a "success on parole" and how, if he were not, it "would not bode too well for us or any of the other lifers"—as showing how the Board's analysis was "flawed." (*Ibid*.) It is all, in my view, most inappropriate, causing me to write as I do.

## The Standards We Must Follow

Only two years ago, our Supreme Court made a thorough examination of the "some evidence" standard, including what it does and does not encompass.

" '[I]n evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' " (*In re Shaputis* (2011) 53 Cal.4th 192, 209.)

"It is settled that under the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor . . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' [Citations.]" (*In re Shaputis, supra,* 53 Cal.4th at p. 210.)

"While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing. [Citation.] Only when the evidence reflecting the

2

inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor." (*In re Shaputis*, *supra*, 53 Cal.4th at p. 211.) "Under the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Id*. at p. 212.)

"When reviewing a parole unsuitability determination by the Board or the Governor, a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole. [Citations.] The court may not, . . . substitute its own credibility determination for that of the parole authority. [Citations.] Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard." (*In re Shaputis*, *supra*, 53 Cal.4th at p. 214.)

The court called the "some evidence" standard " 'extremely deferential.' " (*In re Shaputis*, *supra*, 53 Cal.4th at p. 214.) This court called it "ultra-lenient." (*In re Morganti* (2012) 204 Cal.App.4th 904, 907.) The restrained scope of view is required by a proper acceptance that "[w]hether to grant parole . . . is a decision vested in the executive branch, under our state Constitution and statutes." (*In re Shaputis*, *supra*, at pp. 198-199.) The "some evidence" standard "must not operate so as to 'impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch,' " or "encroaching on the broad authority granted to the Board and the Governor." (*Id*. at p. 215.)

## The Significance of Adequate Plans, and Butler's Lack of Them

Butler's petition, and the majority opinion, focuses exclusively on Butler's plans for employment and housing, the majority describing it this way: "the Board's concerns about Butler's parole plans focused significantly on the lack of verification of support from his family, such as a current letter from his mother stating that he could live with her." (Maj. opn, p. 34.) As discussed in detail below, I view the record here as involving much more than that, a record, I submit, the majority skews by its disregard of much of

3

what went on at the hearing—not to mention its recitation of a few isolated comments that might be said to favor Butler, a reading of the record contrary to that required by *Shaputis*. Before turning to that discussion, however, I begin with some observations about the significance of an inmate's plans, and how he proposes to cope with life outside prison.

This court has published nine opinions holding in favor of inmates, concluding that there was not some evidence of current dangerousness: *In re Stoneroad* (2013) 215 Cal.App.4th 596; *In re Morganti*, *supra*, 204 Cal.App.4th 904; *In re Young* (2012) 204 Cal.App.4th 288; *In re Moses* (2010) 182 Cal.App.4th 1279; *In re Juarez* (2010) 182 Cal.App.4th 1318; *In re Barker* (2007) 151 Cal.App.4th 346; *In re Elkins* (2006) 144 Cal.App.4th 475; *In re Scott* (2005) 133 Cal.App.4th 573; and *In re Scott* (2004) 119 Cal.App.4th 871. In the course of those opinions, we devoted thousands of words, sometimes writing for pages, discussing the inmate's plans. Yes, these discussions included employment and housing. But those discussions included family. And friends. And support groups. And organizations available to provide the necessary support. And myriad other things. Why would we have done that if the adequacy of the inmate's plans did not bear significantly on the only issue before us in those cases—current dangerousness?

The majority sets forth some, and I emphasize some, of the contents in the prior reports and evaluations of Butler, giving some of his prior history. Likewise does the majority discuss some of what occurred at the hearing. A full description paints a much different picture.

As indicated, as early as 2005 Butler was advised that his parole plans were not backed up by any letters of support "verifying" those plans for either employment or housing, and that "a letter of support is needed." This apparently led to the two letters in 2005, quoted in full in the majority opinion. (Maj. opn., pp. 6-7.)

The evaluation for the 2009 hearing was almost identical, except that it states that "If Butler were to be granted parole, Butler claims that he would be able to obtain employment with Pastor Tony Williams. *Letter forthcoming*." (Italics added.) No letter

4

followed for the hearing, and nothing more was received from Pastor Williams until the 2011 letter, also quoted in full by the majority. Moreover, and as the majority notes, what Butler told the psychologist preparing the evaluation for the 2009 hearing was somewhat different as to his claimed plans. (Maj. opn., p. 7.) Perhaps most relevant here, Butler told the psychologist that "he planned to present several letters of support at the next [hearing]." Butler did not carry out his "plan." No letters were submitted.

But the evaluation for the 2009 hearing is significant beyond showing that Butler did not come through on what he said he would do. The evaluation is significant because of the psychologist's entries in the "Risk Assessment/Conclusions" section where, explaining some of the reasons for Butler's scores on the tests given, the psychologist said this: "In the 'management of future risk' domain some concerns were noted. The inmate's scores were affected by a moderate probability of destabilizing influences and stress upon release. . . . [¶] He will encounter a certain level of unavoidable stress as he transitions from the highly structured milieu of prison to the community after such a lengthy incarceration. He reports ongoing contact with family members; however there were no updated letters of support present. Plans which lack feasibility and stress correlate with recidivism."

As will be discussed at length below, Dr. Thacker's more current evaluation in 2011 expressed similar concerns, including that "[i]t is likely that Mr. Butler will be exposed to some stressors or de-stabilizers in the free community including, but not limited to the typical stressors associated with returning to the community after a long period of incarceration, and family or relationship conflicts. Also, he has never established and maintained his own residence and will need to learn those skills. Mr. Butler seemed to have a limited understanding of the potential challenges or stressors he may encounter in the community and is encouraged to further explore this area and enhance his parole plans so that his plans address how he will manage any potential challenges."

5

This concern, of course, refers to more than just employment and housing, and in the course of rendering the decision Presiding Commissioner Peck confirmed this concern, and the danger it presented, this way:

"So when we look at you reentering society with I will say extremely limited support because we know how important support is because the world that you left is not the world you're going back to.  There are things  that are much different out there that you haven't even, yeah, you're going to need the support.  Things are different out there than they were when you went to prison in 1988.  So as advice to you before I turn it over to my fellow Panel members, as an advice to you is support.  Get some support.  I know you've got family out there.  Get their support.  Communicate with them.  Have them make some offers of support.  I don't care if your sister or your brother . . . [¶] . . . [¶] . . . I want to know that if you have trouble out there, if adapting back to free society after all these years in a controlled environment I want to know that you can pick up the phone and you can call her, and that she's going to be able to help you through problems.  I want to know that your brother in Sacramento who is close can help you when you need it . . . What's going to make you the most successful?  What do you think is going to make you most successful? . . . That's all part of understanding how you're going to be successful because remember something, before you came to prison, you weren't making the best decisions, and we want to make sure that you know how to make the best decisions now to keep yourself out of trouble.  Read these transcripts, Mr. Butler, because I don't want you to get off track."

Deputy Commissioner Lawin had earlier expressed similar concerns, this following Butler's express agreement with statements in Dr. Thacker's report that Butler had "lost contact with friends in the community" and "only [has] contact with family now."  When Butler answered "yes," that was true, the deputy commissioner went on for several pages expressing why this was a concern:  "The doctor felt that your—you have the basic building blocks in place in terms of parole plans, a place to live, and a part-time job.  Wrote, however, that it didn't appear that you've thought through the various challenges or issues you may encounter in the community and how you plan to address

6

each of them. . . . The doctor writes that you've never lived on your own nor been responsible for maintaining a residence, and you will need to learn and develop those skills. Under mental health history, the services that you've received are noted here. In particular, the fact that you were shot in the head in 1996 and then you suffered symptoms with post-traumatic stress disorder, PTSD. You were placed in CCMS and you also at some point were in EOP. Then ultimately you were released from mental health care in 2000 completely. In terms of self-assessment and insight, the doctor writes that, 'Mr. Butler . . . appeared to have spent less time focusing on his future and how his insights regarding his past could be applied to his future to develop plans and goals about what to pursue, what obstacles he may encounter, and how he should best respond to and manage those obstacles.' . . . 'An analysis of risk is provided, and the most pertinent risk factor under the first tool, the LS/CMI, the doctor writes is his lack of having incorporated the fostering of prosocial relationships with acquaintances and friends, as well as organized resources in the community.' . . . [¶] . . .[¶] 'And that he'll be likely exposed to some stressors or destabilizers in the free community. That he'll need to learn skills to live on his own as indicated earlier.' "

After those lengthy observations, the deputy commissioner asked Butler if he had any comments. He answered "No."

As indicated above, our opinions have discussed at length the plans successful inmates demonstrated to their boards. Those discussions show the support, and support systems, that the inmates had developed to assist them in their transition back to civilian life. Those discussions also show, at least inferentially, some of the programs and opportunities available to an inmate to help develop such support. And those opinions show, by contrast, how Butler has done essentially nothing.

*In re Barker, supra,* 151 Cal.App.4th 346, provides a good illustration. Barker, like Butler, was young (16) when he committed his crime; like Butler, he had no prior history of violent crime; and like Butler, he spent well over 20 years in prison. That is where the similarity ends. Granting Barker's petition for habeas corpus, we noted that the Board had received "10 letters urging that parole be granted," going on to elaborate as

7

follows: "Most of the letters were from people Barker had met while he was in prison and who had come to know him through various proprisoner programs in which they volunteered or participated, some of whom no longer participated in these programs but nevertheless continued to visit Barker. One such letter was from a marriage and family therapist who described 'how long a way' Barker had come 'in accepting responsibility for the crime,' and who went on to say that, if paroled, Barker 'has solid support from his mother, myself, and my family and many of our friends.' Another letter was from Barker's 86-year-old mother, who wrote that she 'visited [her] son almost every week since his incarceration . . . [and] watched him and enjoyed seeing him grow from a boy to a man.' In sum, these letters offered Barker places to live and personal and financial support upon his release on parole." (*Id.* at p. 357.)

Later discussing the suitability factor favoring Barker, we summed up this way: "[T]he Board acknowledged Barker had 'been working very hard on [his] self-help areas,' and listed eight programs he had participated in while in prison. The Board noted Barker had 'good vocational skills,' later mentioning he had completed vocational training in airframe and power plant and that his skills included 'being a plumber and an auto mechanic.' The Board also noted that Barker had 'realistic parole plans,' including viable residential plans both with friends and with his mother, and that he had 'acceptable employment plans' and 'marketable skills.' Finally, the Board commended Barker for obtaining his G.E.D. And 45 units of college credit, the latter of which the Board called 'definitely a noteworthy achievement.' " (*In re Barker*, *supra*, 151 Cal.App.4th at pp. 369-370, fn. omitted.)

Among other things, what we learn from *Barker* and other cases is that there are opportunities within prison to help develop the "ability to function within the law on release." (See Cal. Code Regs., tit. 15, § 2402, subd. (d)(9).) Beyond that, comments and colloquy at the hearing indicate there are counselors at the prison to provide such services. Indeed, and as Butler admitted, a constant topic of discussion in the prison yard is transition and housing. For reasons best known to himself—and in disregard of at least eight years of suggestion and advice—Butler has availed himself of none of it. It does

8

not stand him in good stead, especially not when we have seen what other inmates have done. Excerpts from a few of our opinions should suffice. Thus:

*In re Young*, *supra*, 204 Cal.App.4th at page 297: "Petitioner had multiple housing and employment offers in California and New York, including a full-time employment offer from a construction company with jobsites in the Sacramento area, where his brother would provide him housing. He also had a number of letters of support from family and friends. He planned to continue attending AA and NA meetings if released."

*In re Scott, supra,* 119 Cal.App.4th at page 883: "The panel member then described numerous correctional counselor reports uniformly lauding Scott for his 'excellent' progress while in prison and pointing out, among numerous other supportive statements, his 'work ethic,' 'mature attitude,' and the high quality of his interpersonal relationships. Most of these reports emphasized Scott's sustained and productive participation in a variety of self-help programs . . . . [¶] All of Scott's children informed the Board in writing of their intention to collectively provide him housing, financial assistance, work in the refrigeration business and a supportive family environment. A former business partner and a veteran's organization also expressed their ability and willingness to provide Scott employment in the field of refrigeration."

*In re Elkins*, *supra*, 144 Cal.App.4th at pages 482-483: The conclusion of the Board panel included these comments: " '[W]hile in prison, the prisoner ha[s] enhanced his ability to function within the law upon release through participation in college programs. Although he doesn't have an associate degree, he is participating in that program. We know that he's gotten a GED since he's been in, and just an array of self-help programs. . . . [Listing 10 such programs] We also note that he ha[s] enhanced his . . . ability to get a job. He participated in vocational programs. We note that as maintenance mechanic, automobile mechanic, most important in the PIA industries, which in some instances are better than vocation because he actually ha[s] a chance to work in that environment and achieve a journeyman level . . . . I've been doing these for quite a while and I have not seen that many letters of support from supervisors. . . . He

9

ha[s] realistic parole plans which include[ ] a job offer, a realistic job offer in a hardware store. His mother said that he could live with her.' "

All that leads to the issue before us: is there any evidence in the record that supports the Board's decision. There is indeed, and the decision should be upheld, as it is supported by "some evidence." More than a modicum in fact, several modicums.

### The Board's Decision Is Supported by Some Evidence

I begin with Dr. Thacker's evaluation, which begins by concluding that Butler is, at present, "a **low/moderate** risk for violence in the free community. A low/moderate risk indicates that this evaluator believes the individual represents *a slightly elevated risk of violence*"—an evaluation, not incidentally, that *elevated* Butler's risk assessment from "low" to "low/moderate," as far as I can tell, the first time Butler has been so evaluated. I can only surmise why Dr. Thacker elevated the risk, but perhaps at least eight years of unheeded guidance and suggestions—not to mention, increasing isolation—contributed to it. Regardless, is this not by itself "some evidence?" Clearly, the Board ultimately must have agreed with Dr. Thacker's assessment. That is itself a credibility determination we cannot overturn. It impacts the ultimate determination of whether Butler should be granted parole. Slight or not, the Board would naturally—and rightly— pause at freeing an inmate elevating into a "moderate risk for violence" if released. So why is this conclusion alone, not treated as "[a]ny relevant evidence" and thus sufficient to satisfy the "some evidence" standard as expressly allowed by out Supreme Court?

Dr. Thacker's evaluation was not a naked conclusion. It was backed up with three paragraphs of analysis. The majority does not attempt to discredit or take issue with any of Dr. Thacker's reasoning. It cannot be dismissed as arbitrary just because the Board found it credible. (Cf. *In re Shaputis*, *supra*, 53 Cal.4th at pp. 212 ["Nor was it arbitrary for the Board to doubt the credibility of the documentary evidence submitted by [the inmate]"], 215 ["When, as in this case, the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary."].) So, if it was credible, was not arbitrary, and is clearly relevant to the issue before the Board, why is it not accepted by the majority, thus

10

ending our inquiry? "While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing." (*In re Shaputis*, *supra*, 53 Cal.4th at p. 211.)

But we need not stop there. The three paragraphs supporting Dr. Thacker's conclusion are just as capable as qualifying as "some evidence." Dr. Thacker told the Board:

"Based on a review of the case, the risk factor currently of most concern for Mr. Butler involved his parole plans. He reported that he plans to live with his mother, work part-time at his mother's church, and apply to be compensated for being his mother's caregiver. He stated that he would be involved in other positive activities to help the community such as hunger drives, etc., but did not have specific information regarding possible agencies or organizations with which he could become involved. He also had not sought out resources or agencies available to him for support in the community such as mental health services or access should his symptoms of PTSD or depression return. When describing himself, Mr. Butler admitted that he can be lazy at times. His plans appeared to rely heavily upon his mother, suggesting that he has opted to rely upon his mother and has not exerted the effort to establish plans which also include potential resources/sources of support outside his mother.

"Mr. Butler's risk of violent recidivism would significantly *increase* if he associated with antisocial peers. His risk of violent recidivism would likely also increase if he used intoxicating substances, found himself without a stable residence, lacked income sufficient to meet his living expenses, or inadequate social support in the community. [¶] . . . Most importantly, Mr. Butler could *decrease* his risk by establishing and verifying comprehensive, detailed parole plans which consider possible challenges he may face in the community and address how he will guard against or manage those challenges."

Even without Dr. Thacker's conclusion, this underlying reasoning could be accepted by the Board as equally credible. It is clearly relevant to the issue decided by the Board, so why is it disqualified from being "some evidence"?

But Dr. Thacker was not done. "The most pertinent risk factor identified by the LS/CMI for Mr. Butler was his lack of having incorporated the fostering of pro-social relationships with acquaintances and friends as well as organized resources in the community. As noted, his parole plans were feasible but very basic and lacking in detail. Such detail could be incorporated by researching and contacting support agencies in the community to which he plans to parole and noting how such resources could be used if he is released to the community to help facilitate his successful transition and guard against the possibility of influence by negative sources. This concern stems from Mr. Butler's reports that he was often involved in criminal or negative behavior in order to fit in with his peers. He began to address the issue somewhat through his plans to be involved in church; however, this issue could be more extensively addressed by developing more detailed plans." This paragraph was found sufficiently troubling that Deputy Commissioner Lawin read it to Butler at the hearing and asked if he had "any comments" to make in response. Butler simply answered, "No." As Butler seemed to believe that he had no problems beyond employment and residency that required plans, the Board could legitimately take this lack of self-awareness into account. Why is this too rejected as not "some evidence"?

The majority cannot deny that, in addition to dangerousness, one of the "Circumstances Tending to Show Suitability" for parole is that "The prisoner has made realistic plans for release . . . ." (Cal. Code Regs., tit. 15, §§ 2281(d)(8), 2402(d)(8).) Inverted, if a prisoner does *not* have "realistic plans for release," that is a circumstance tending to show that he is *not* suitable for parolee. This was the approach employed by our colleagues in Division Three, in *In re Cerny* (2009) 178 Cal.App.4th 1303, 1314, the only decision to address the plans factor at any length.

It is true that the two regulations place the circumstance among "Circumstances Tending to Show Suitability" (Cal. Code Regs., tit. 15, §§ 2281(d), 2402(d)), and not

12

among "Circumstances Tending to Show Unsuitability" (Cal. Code Regs., tit. 15, §§ 2281(c), 2402(c)), but this placement does not eliminate an inmate's plans from consideration as a negative factor. The regulations direct that "All relevant, reliable information available to the panel shall be considered in determining suitability for parole . . . including . . . any other information which bears on the prisoner's suitability for release." (Cal. Code Regs., tit. 15, §§ 2281(b), 2402(b).) If the Board interprets its regulations as making the absence of realistic postparole plans a negative factor, we are supposed to defer to that interpretation unless it is clearly erroneous. (*In re Andrade* (2006) 141 Cal.App.4th 807, 815.)

Our colleagues in Division Three concluded that the Board's interpretation was hardly erroneous, much less clearly erroneous. "[B]ased on its clear language, the regulation's requirement that an inmate have parole plans is limited to requiring realistic plans. The entire thrust of the regulation is on practicality. . . . [T]he regulation does not suggest that . . . fool-proof plans are necessary. The plain language of the regulation supports the opposite conclusion. By referring to 'realistic' parole plans, the regulation does not contemplate ironclad and unrealistic plans." (*In re Andrade*, *supra*, 141 Cal.App.4th at p. 817.) But Division Three was clearly comfortable with the interpretation that the regulations do "require" an inmate to have plans, that the plans are also required to be realistic, and that, if the inmate does not have realistic plans, this could be considered by the Board and, as shown in *In re Cerny*, *supra,* 178 Cal.App.4th at pages 1306, 1313-1315, can by itself serve as a valid basis for denying parole.

Here, the Board concluded that Butler did not demonstrate that he had "made realistic plans for release." If the Board chose to emphasize this factor, it is not for a court to reweigh the importance of it. (See Cal. Code Regs., tit. 15,§§ 2281(d), 2402(d) ["the importance attached to any circumstance . . . in a particular case is left to the judgment of the panel"]; *In re Shaputis*, *supra*, 53 Cal.4th 192, 210-211.) In other words, it is not for this court to decide that this factor is outweighed by others, or is not of sufficient significance to justify the Board's decision.

As demonstrated by the lengthy discussion above, the concern about Butler's parole plans was not making its first appearance. It started at least as early as 2005, and as indicated from the hearing—indeed, as expressly reflected in the reports—Butler has consistently been advised of the concern, and made no meaningful attempt to respond to it. The Board could treat Butler's willful refusal to face unpleasant possibilities or unexpected vicissitudes as not being a "realistic plan for release." The Board could treat Butler's persistent failure to provide documentary verification of crucial matters as circumstantial evidence of something far less benign than isolated episodes of inattention of lapses of memory. The Panel could treat it as a pattern—Presiding Commissioner Peck's word—of failing to substantiate Butler's claimed resources, which might produce doubt as to the validity of those claims. (See Cal. Code reg., tit. 15, § 2402(b) ["Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."].) This was not merely a bureaucratic fastidiousness about dotting every "i" and crossing every "t." Dr. Thacker specifically tied Butler's "risk of violent recidivism" to his "establishing and verifying comprehensive, detailed parole plans which consider possible challenges he may face in the community and address how he will guard against or manage those challenges." Despite it all, Butler provided essentially nothing.

Butler admitted he had cut off all relationships with friends, and that he was dependent on "family." So far as the record reflects, that family consists of his mother in Santa Clara, his grandmother in San Jose, and four siblings. The identities of the siblings are nowhere mentioned, nor (with one exception) are their whereabouts. There is no indication in the record that any sibling is close to Butler, certainly no evidence that any ever visited him. Similarly, there is no evidence that Butler's grandmother ever visited. And as to his mother, admittedly now disabled, she visited Butler "eight or nine times" in the 26 years he has been in prison.

That is the sum total of Butler's entire support system. That and Pastor Williams who, as Butler admitted, has never visited him. And as to Butler's interaction with the pastor, at one point Butler said they "talked some years ago about what I want to do."

14

But even assuming, however improper it would be, a reading of the record favorable to Butler, it still shows inadequate plans. His mother and/or grandmother and Pastor William would be Butler's entire support system. But these supports may not be immutable: his mother's health is not robust, and she already requires a caregiver; his grandmother is almost 80; and Pastor Williams may not always be pastor of the Maranatha Christian Center. At the hearing, Commissioner Peck questioned Butler about the depth of his postrelease support net: "if your grandmother has passed on and your mother is too ill to be able to welcome you into her home, and the church pastor accepts a position elsewhere, what's your plan B?" Butler's answer: "Well, I go to work. I have to do it. I have no choice but to do it, but to go out there, apply for work, get a job. I mean determination and my will to want to do the right thing will help me a whole lot." The Board did not have to be impressed with his assurance, especially as Dr. Thacker saw in this attitude an undue reliance upon the mother that went hand-in-glove with Butler's unwillingness to explore other resources. The Board could treat Butler's ideas for dealing with adversity as falling short of constituting a "realistic plan."

For an inmate already teetering on the border of being a "**low/moderate** risk for violence," Butler certainly did himself no good by refusing to comment on the existence of such possibilities. Like Dr. Thacker, the Board could treat these potential dangers as warranting additional safeguards and precautions, even if the pastor and Butler's maternal relatives were present and exercising a restraining influence.

The Board told Butler this was a "pattern" that "seems to keep on coming up in your hearings," one that "you're not fixing." I do not think it a flight of unreason for the Board to conclude that an inmate with an appreciable risk of violence who repeatedly declines, or refuses, or is unable to assuage legitimate concerns about what Dr. Thacker termed the "stressors" that could *increase* that risk, might not be suitable for release. Why is this not accepted by the majority as "some evidence"?

Where Butler would stay and what he would do were major issues. On the first, Butler had changed his residence plan from his grandmother, then to his "aunt or god mother or sister in Oakland," and finally to his mother. His grandmother had provided a

letter back in 2005, but that was the only verification before the Panel—and seven-years old at that. As for Pastor Williams, his 2005 offer of "all available resources" had by 2011 constricted to the church's "Overcomer's Outreach Ministry, which is designed to support past substance abusers and a Men's Department, which is available to disciple men in various capacities." Butler does not appear to have a substance problem, so it is unclear just what could be provided by the Overcomer's Outreach Ministry. Just what "disciple [in] . . . in various capacities" could be provided by the Men's Department, and what use they might be to Butler, is not explicated. A guarantee of housing is hardly a compelled interpretation of the two letters.

With respect to Butler's future employment, it was initially planned to be construction work for his cousin Art. Then it might be with Pastor Williams, "who operates several businesses and *may* employ him upon his release." (Italics added.) This troubling imprecision was obviously brought to Butler's attention, and he promised to "present several letters of support" at the 2009 hearing. He did not do so. By the time of the latest hearing, Butler told Dr. Thacker his prospects were now for "working in the youth program . . . odd jobs around the church, " and perhaps becoming his mother's caregiver. The job with the church was to be "full time," but only according to a verbal promise from Pastor Williams. He did not know what he would be paid. None of these significant questions are answered in the pastor's "updated" letter in 2011. Nothing in the letters looks remotely like a guarantee of paid employment.

On the subject of the quality of Butler's plans if released, it is proper to accept that on this subject the Board may possess some special expertise. Until today, this court has consistently accepted that the adequacy of an inmate's postrelease plans are a valid consideration, and has just as consistently deferred to the parole authority's expressed conclusion on the subject. (See *In re Morganti*, *supra*, 204 Cal.App.4th at p. 911; *In re Moses, supra,* 182 Cal.App.4th at p. 1294; *In re Barker, supra,* 151 Cal.App.4th at pp. 360, 369; *In re Elkins, supra,* 144 Cal.App.4th at pp. 483, 492; *In re Scott, supra,* 133 Cal.App.4th at p. 594; *In re Scott* (2004) 119 Cal.App.4th 871, 898.) But no longer.

16

## Some Closing Observations

Following its discussion of why there was no evidence of lack of insight (maj. opn., pp. 23-24), the majority turns to the section entitled "Remedy." That section proceeds to finding that "three aspects of the Board's decision inform [the majority's] conclusion," the first of which is that the "Board directly related concerns about parole plans to its improper lack of insight analysis." (Maj. opn., p. 27) This reading of the record, I submit, exists only in the eyes of the majority, and represents, I further submit, a reading of the record directly contrary to the mandate of *Shaputis.* Indeed, such reading of the record conflicts with the statement of Butler's own counsel, whose petition describes, accurately, that inadequate parole plans was "one of the two criteria to deny parole."

Such reading of the record also disregards the actual comments by the commissioners at the hearing, including those of Presiding Commissioner Peck, who devoted over three fourths of his decision to a discussion of lack of plans, not to mention the comments of Commissioner Lavin, who talked only of plans. The majority disregards all that, and reads the record as indicated, to lead to the conclusion that a decision to deny parole cannot stand unless it reflects an "individualized consideration of all the relevant facts and factors." (Maj. opn., p. 27) And so, the majority concludes, it must follow the precedent it claims to find in *In re Criscione, supra,* 180 Cal.App.4th at p. 1461; *In re DeLuna, supra,* 126 Cal.App.4th at p. 598; *In re Smith, supra,* 114 Cal.App.4th at p. 373; and *In re Capistran, supra,* 107 Cal.App.4th at pp. 1306-1307. Hardly.

*Smith* and *Capistran* arose from Board grants of parole and reversals by the Governor. They have no applicability here. *Criscione reversed* the trial court's grant of habeas corpus, and held that, although there was evidence to support many suitability factors, the Board's concern with whether the prisoner had been rehabilitated was some evidence to deny parole. (*Criscione, supra,* 180 Cal.App.4th at p. 1461.) That leaves only *DeLuna,* which, while holding for the inmate, noted that a court "will uphold the denial of parole when it appears that the Board would have reached the same conclusion

17

based on the supported factors and those factors individually or collectively justify that conclusion." (*DeLuna, supra,* 126 Cal.App.4th at p. 598.) That, to me, aptly describes the record here.

It is true that the parole process and procedure have over the years been beset by problems, caused frequently by boards that refused to act properly and sometimes by governors who improperly reversed boards which had. Our nine opinions over the years sought to address these problems, as have the countless opinions of our colleagues around the state, efforts that have seemingly had a salutary effect. The majority nevertheless holds today that much more is needed and has added a level of burden onto the Board that is, frankly, unprecedented.

The psychological assessment contains little, if any, discussion of the suitability and unsuitability factors, which would necessitate the commissioners undertake independent research before the hearing. However long that would take, it would have to be followed by appropriate testimony and colloquy at the hearing itself. Then, when it announces its decision, the Board must address this suitability factor, and then that one, and then the next, until all nine factors are examined. The Board must then turn to the discussion each of the six unsuitability factors, finally to discuss how all 15 factors interact. Only then can the Board render its decision, only after the Board has shown that it "considered the interrelationship of all relevant facts and factors." (Maj. opn. p. 32) It will be, I submit, pointlessly burdensome.

My review of the record has found more than one modicum of evidence supporting the Board's decision. That decision was not arbitrary, capricious, or based on guesswork, but a reasonable evaluation of the record. (*Shaputis, supra,* 53 Cal.4th at pp. 212, 214, 219.) I would deny the petition.

_____
Richman, J.

18

Trial Court:                                   Alameda County Superior Court

Trial Judge:                                   Hon. Larry J. Goodman


Attorneys for Petitioner:                      Keker & Van Nest LLP
                                               Under appointment by the
                                               Court of Appeal
                                               Jon B. Streeter
                                               Sharif E. Jacob
                                               Benita A. Brauhmbhatt

Attorneys for Respondent:                      Attorney General of California
                                               Kamala D. Harris

                                               Jennifer A. Neill
                                               Senior Assistant Attorney General

                                               Claudia H. Amaral
                                               Supervising Deputy Attorney General

                                               Amber N. Wipfler
                                               Deputy Attorney General